**SECOND INJURY FUND, Plaintiff,**

v.

**STREATOR CHEVROLET and/or Utah State Insurance Fund, Howard E. Webb and the Industrial Commission of Utah, Defendants.**

No. 19595.

Supreme Court of Utah.

Nov. 18, 1985.

---

**10.** 526 P.2d at 1189 (footnote omitted).

**11.** *Intermountain Smelting Corp.,* 610 P.2d at 337.

David L. Wilkinson, Atty. Gen., Gilbert A. Martinez, Salt Lake City, for plaintiff.

James R. Black, Dennis V. Lloyd, Stuart L. Poelman, Salt Lake City, for defendants.

ZIMMERMAN, Justice:

This case raises for the first time the proper interpretation of the 1981 amendments to section 35–1–69(1) of the Code relating to the circumstances under which an injured worker is entitled to recover not only for permanent partial incapacity caused by an industrial injury, but also for permanent partial incapacities incurred prior to the industrial injury. The Industrial Commission awarded claimant Webb compensation for permanent partial incapacity resulting from injuries to his back sustained as a result of an on-the-job accident in 1982. It also awarded him compensation for preexisting permanent partial incapacities attributable to (1) an earlier injury to his back, which was aggravated by the 1982 fall and injury, and (2) unrelated congenital or degenerative problems with his hands and eyes. The Second Injury Fund was ordered to pay that portion of the award attributable to the preexisting impairments and challenges that award by writ of review. We hold that the award made by the Industrial Commission was correct and affirm, albeit on slightly different grounds.

In April of 1982, claimant Webb slipped and fell on some stairs at his place of employment, Streator Chevrolet in Salt Lake City. He injured his left elbow and his lower back. At the time of this accident, Webb had three preexisting impairments: a lower back injury sustained in Arizona in 1964 while working for another employer (for which no compensation award was ever paid); a condition of the hands known as Dupuytren's Contractures, which causes curling of the fingers; and impaired vision in both eyes. The hand and eye conditions were unrelated to any industrial accident or injury. Following the 1982 accident, Webb's back condition worsened and surgery was required to remove dam-

aged discs. He then filed a claim for compensation with the Commission.

A medical panel reviewed his case. It reported no permanent impairment as a result of the injury to the left elbow. However, it did find that Webb had a 10 percent whole-man permanent partial impairment by reason of the back injury suffered as a result of the 1982 fall; an additional 15 percent whole-man permanent partial impairment from his prior low back injury, which was aggravated by the fall; an 11 percent whole-man permanent partial impairment due to the hand problem; and a 20 percent whole-man permanent partial impairment due to vision problems. Using the analysis set forth in *Jacobsen Construction v. Hair*, Utah, 667 P.2d 25, 27–28 (1983), the medical panel found that the preexisting conditions combined to produce a rating of 39 percent permanent partial impairment.

The administrative law judge adopted the panel's findings as his own. He concluded that under the *Hair* rationale the rating of the 10 percent whole-man impairment resulting from the industrial injury must be adjusted on a partial-man basis to account for the preexisting impairments. Since claimant was 61 percent unimpaired before the accident (100% – 39% = 61%), the 10 percent whole-man impairment caused by the accident added 6.1 percent to his disability (10% × 61% = 6.1%), giving a rounded final permanent partial disability figure of 45 percent (39% + 6% = 45%). The defendants—the employer and/or its insurer, the State Insurance Fund—were found entitled to reimbursement from the Second Injury Fund for ³⁹⁄₄₅, or 87 percent, of future medical payments to the claimant. The defendants also were held liable for a 6 percent award, or $3,201.12, of the total 45 percent permanent partial disability award. The Second Injury Fund was held responsible for the remaining 39 percent permanent partial disability award, or $20,807.86, to be paid to Webb "for the aggravation of a pre-existing condition by the industrial injury" of April 1982.

The Second Injury Fund did not contest the finding that it was liable for the preexisting back injury that was aggravated by the industrial accident. However, insofar as the award required payment for the other preexisting impairments, the Second Injury Fund did challenge it before the full Commission on the following grounds: (1) that the preexisting impairments were not aggravated by the accident and, therefore, were not compensable under the statute; and (2) that before nonaggravated preexisting conditions can be compensable, the statute requires that the industrial injury must cause at least a 10 percent impairment, while here the impairment caused by the industrial injury was only 6 percent. The Commission, one member dissenting, rejected the Fund's challenge and affirmed the administrative law judge's order. It held that, under the statute, recovery for all preexisting conditions was permitted when any one of them was aggravated by the industrial accident. The Second Injury Fund then filed a petition for review with this Court, raising the same arguments rejected by the Commission.

The facts are not disputed, nor are the findings of impairment challenged. This case presents only a question of law: under the 1981 amendments to section 35–1–69, what is the Second Injury Fund's responsibility for preexisting impairments not aggravated by the subsequent industrial injury? Answering this question requires some descriptive background of the 1981 amendments.

The Second Injury Fund, previously named the Special Fund, *see* 1979 Utah Laws, ch. 138, § 3, has long been a part of the Utah worker's compensation scheme. In 1919, the legislature provided that if a worker having a preexisting permanent partial disability was injured and incurred a permanent partial disability that was greater than he would have incurred but for its combination with the preexisting partial disability, then the worker was to receive full compensation for all his disabilities. However, he was to receive from his present employer only compensation for the current injury; compensation for the

preexisting disability was to be paid by a fund established by the legislature. 1919 Utah Laws, ch. 63, § 3140.6. We have long acknowledged the remedial purpose of this law:

> The Legislature undoubtedly intended ... to provide protection for men who had already been partially permanently disabled, but yet were able to do work. Without some provision of this kind, employers would be extremely hesitant in employing men partially disabled, since an injury resulting in partial permanent disability of the employee might well impose greater liability on the employer than a similar injury incurred by a person not previously disabled.

*Marker v. Industrial Commission,* 84 Utah 587, 592, 37 P.2d 785, 787 (1934); *see McPhie v. United States Steel Corp.,* Utah, 551 P.2d 504, 505 (1976); *Intermountain Smelting Corp. v. Capitano,* Utah, 610 P.2d 334, 337 (1980); *Northwest Carriers, Inc. v. Industrial Commission,* Utah, 639 P.2d 138, 141 (1981); *Jacobsen Construction v. Hair,* Utah, 667 P.2d 25, 26 (1983).

The provision added in 1919 is now in section 35–1–69 of the Code. Insofar as pertinent here, it remained substantially unchanged from 1919 until 1963. At that time, the statute was amended to clarify that the preexisting permanent partial disability did not have to be the result of an industrial accident; it could be the result of "accidental injury, disease, or congenital causes." 1963 Utah Laws, ch. 49, § 1. The important thing was that some disability predated the industrial accident. The 1963 amendment also changed the statute to require that the permanent incapacity resulting from the combined impairments be "substantially greater" than would have been the case if there had been no preexisting incapacity. *Id.* The prior law had required only that the incapacity from the combined injuries be "greater" than otherwise.

During the years immediately before the 1981 amendments, this law was interpreted in several significant cases. On the quantitative question of what degree of increased incapacity was required by the words "substantially greater," the Court held that it

was enough if the contribution of the preexisting impairment to the total combined impairment was "definite and measurable." *Intermountain Health Care, Inc. v. Ortega,* Utah, 562 P.2d 617, 619 (1977). A qualitative question was also raised as to whether the words "substantially greater" required that any particular relationship exist between the industrial injury and the preexisting impairment. The Second Injury Fund contended that there should be no compensation for preexisting impairments unless there was some causal or functional relationship between the preexisting impairment and the industrial injury. The Court rejected this contention. It was enough if the two impairments cumulatively resulted in a greater degree of disability. *Intermountain Smelting Corp. v. Capitano,* 610 P.2d at 337; *see Kincheloe v. Coca-Cola Bottling Co.,* Utah, 656 P.2d 440, 442 (1982) (discussing *Capitano* holding). Finally, the Court made it plain that section 35–1–69's language covering preexisting impairments caused by "injury, disease, or congenital causes" was broad enough to reach psychiatric impairments, as well as those occasioned by old age, mental inability and lack of training. *See Intermountain Health Care, Inc. v. Ortega,* 562 P.2d at 620; *Northwest Carriers, Inc. v. Industrial Commission,* 639 P.2d at 141–42.

The Industrial Commission apparently did not agree with the *Ortega* decision, and perhaps others of this group, and declined to follow them in several cases, either refusing to award compensation for preexisting impairments or refusing to order payment by the Second Injury Fund, thus requiring the employer to pay the full compensation award. *See White v. Industrial Commission,* Utah, 604 P.2d 478, 480 (1979); *Capitano,* 610 P.2d at 337; *Utah Legislative Survey-1981,* 1982 Utah L.Rev. 212, 213–14 & nn. 652–54. This Court suggested that the Commission address its concerns to the legislature, which has the power to change the statute, rather than taking the matter into its own hands by refusing to follow this Court's decisions. *Intermountain Smelting Corp. v. Capitano,* 610 P.2d at 337. The 1981 amend-

ments to section 35-1-69 are the apparent result of legislative consideration of these various issues, or so we were informed at oral argument by counsel for the Second Injury Fund.

The differences between the language added by the 1981 amendment and the prior statute are as follows:

35-1-69. COMBINED INJURIES RESULTING IN PERMANENT INCAPACITY—PAYMENT OUT OF SECOND INJURY FUND—TRAINING OF EMPLOYEE. (1) If any employee who has previously incurred a permanent incapacity by accidental injury, disease, or congenital causes, sustains an industrial injury for which either compensation ~~and~~ or medical care, or both, is provided by this title that results in permanent incapacity which is substantially greater than he would have incurred if he had not had the pre-existing incapacity, or which aggravates or is aggravated by such pre-existing incapacity, compensation, ~~and~~ medical care, ~~which medical care~~ and other related items ~~are~~ as outlined in section 35-1-81, shall be awarded on the basis of the combined injuries, but the liability of the employer for such compensation, ~~and~~ medical care, and other related items shall be for the industrial injury only and the remainder shall be paid out of the ~~special~~ second injury fund provided for in section 35-1-68(1) ~~hereinafter referred to as the "special fund."~~

For purposes of this section, (a) any aggravation of a pre-existing injury, disease, or congenital cause shall be deemed "substantially greater", and compensation, medical care, and other related items shall be awarded on the basis of the combined injuries as provided above; provided, however, that (b) where there is no such aggravation, no award for combined injuries shall be made unless the percentage of permanent physical impairment attributable to the industrial injury is 10% or greater and the percentage of permanent physical impairment

resulting from all causes and conditions, including the industrial injury, is greater than 20%. Where the pre-existing incapacity referred to in subsection (1)(b) of this section previously has been compensated for, in whole or in part, as a permanent partial disability under this act or the Utah Occupational Disease Disability Law, such compensation shall be deducted from the liability assessed to the second injury fund under this paragraph.

(Underlined material added and lined-out material deleted by 1981 amendment.)

The amendment described the relationship that must necessarily exist between the preexisting impairment and the industrial injury impairment in order for both impairments to be compensated. In effect, it gave definition to the concepts underlying the term "substantially greater." It has displaced the "definite and measurable" contribution to impairment definition of "substantially greater" articulated by this Court in *Ortega* (although it would not change the result there) and substituted two more concrete tests that deal differently with situations where an industrial injury aggravates or is aggravated by a preexisting impairment, on the one hand, and those where the industrial injury bears no such relationship to a preexisting impairment, on the other.[1] *See Utah Legislative Survey-1981*, 1982 Utah L.Rev. 212, 214.

■ The first of these new tests we must consider is the "aggravation" test added to both quoted paragraphs of section 35-1-69(1). The language added by the 1981 amendments is not without redundancies and ambiguities. Specifically, the "aggravation" language added to the first paragraph of section 35-1-69(1) reads as an alternative to the "substantially greater" language that precedes it. The language added to the second paragraph, however, suggests that "aggravation" is simply one of two alternative tests that may be met to

---

**1.** Although the test of "substantially greater" set out in *Ortega* has been displaced, the amendments left intact the Court's rulings in *Capitano,* on the lack of need for a causal or functional relationship between impairments, and in *Ortega* and *Northwest Carriers,* on types of compensable preexisting impairments.

satisfy an overarching "substantially greater" requirement. After consideration, we conclude that these alternative constructions are more apparent than real. Regardless of how the statute is read, the overall thrust of the amended law seems clear with respect to aggravation: if the industrial injury results in a permanent impairment that is aggravated by or aggravates a preexisting permanent impairment *to any degree*, then compensation shall be awarded and allocated between the employer and the Second Injury Fund based upon the combined impairments.

■ The Second Injury Fund contends that the Commission erred when, in the present case, it found that aggravation of any one preexisting impairment required compensation for all preexisting impairments, regardless of their relationship to the industrial injury and regardless of their severity. We agree with the Fund. Here the preexisting back impairment was aggravated by the industrial injury. Without more, the aggravation test is met, and compensation should be awarded for these two combined impairments. The Commission has awarded compensation for them, and the Second Injury Fund does not dispute coverage. However, the Commission went on to order compensation for all preexisting impairments. This was error. The language of subsection (a) of the second paragraph of section 35–1–69(1) speaks of aggravation of "*a* pre-existing injury," not *all* such injuries. In addition, the word "aggravate" would seem to require that some relationship exist between the industrial injury and the preexisting impairment that is subject to compensation. There is no such relationship between the second back injury and either the eye or hand impairments. We reject the aggravation test articulated by the Commission and hold that aggravation of the old back injury cannot trigger compensation for unrelated preexisting impairments.

This does not end the matter, however. The amendments to section 35–1–69(1) establish a second and entirely independent test for compensation where there is no aggravation. Under the first paragraph, preexisting impairments are to be compensated for when the industrial injury produces an impairment substantially greater than it would have been absent the preexisting conditions; the second paragraph elaborates on this general standard by stating that no combination of impairments shall be deemed to be "substantially greater" than the industrial injury impairment alone unless the industrial injury impairment is 10 percent or more, and the total impairment from all combined causes is 20 percent or more. In the present case, the total impairment of claimant Webb is far more than 20 percent. The only question is whether the 10 percent minimum is satisfied.

■ The Second Injury Fund contends that the Commission properly fixed the industrial injury impairment at 6 percent on a partial-man basis, rather than at 10 percent on a whole-man basis, because under *Jacobsen Construction v. Hair*, Utah, 667 P.2d 25 (1983), combined partial-man impairment ratings must be used to allocate responsibility between the Second Injury Fund and the employer. We disagree. The amendments to section 35–1–69 set the 10 and 20 percent thresholds in order to assure that both the industrial injury and total impairments reach certain fixed levels of seriousness before any nonaggravating preexisting impairments are compensated. However, there is no indication that the Legislature intended to fix these degree-of-seriousness minimums by reference to the standards articulated by this Court in *Hair* for an entirely different purpose. Therefore, we find no justification for importing partial-man ratings into the 1981 amendments and hold that the 10 and 20 percent threshold figures are whole-man impairment ratings.

If there were any question on this issue, an examination of the consequences of the Second Injury Fund's position would dispel it. To adopt partial-man ratings in order to assess compliance with the minimum thresholds would unfairly deny compensation to those who are the most handi-

1182 ■

capped, while granting it to the less severely handicapped. For example, if two individuals, one with a 20 percent preexisting impairment and another with a 60 percent preexisting impairment, were injured on the job and suffered identical serious but nonaggravating injuries rated as 20 percent whole-man impairments, the individual with the lesser preexisting handicap would recover for his preexisting impairment, while the one more seriously handicapped would not, although he presumably could least afford the additional loss of body function. The reason for this is that under the *Hair* formula, the first individual would be an 80 percent man for evaluation purposes $(100\% - 20\% = 80\%)$, and his industrial injury would still exceed the 10 percent minimum $(80\% \times 20\% = 16\%)$; however, the second would only be a 40 percent man $(100\% - 60\% = 40\%)$, and his identical injury would not reach the 10 percent minimum $(40\% \times 20\% = 8\%)$. Absent explicit language, we cannot presume that the legislature intended such an inequitable result.

■ The Commission should have found that claimant Webb, who had a 10 percent whole-man impairment from the industrial injury, satisfied the nonaggravation test of section 35-1-69 and that he was properly entitled to compensation for all preexisting impairments. The Commission did order this compensation, albeit on improper grounds.

■ One further point needs to be made. The Second Injury Fund contends throughout its briefs that even if the nonaggravation statutory minimums are met, some further showing is necessary before compensation for preexisting impairments may be permitted. It argues that the percentage tests set out in subsection (b) of the second paragraph are separate from the "substantially greater" test in the first paragraph and that industrial injury impairment still must be found to have met the separate "substantially greater" test. To satisfy this test, the Fund claims that some causal or functional relationship must exist between the preexisting impairment

and the current one. To support this proposition, the Fund relies on inferences drawn from our per curiam opinion in *Day's Market, Inc. v. Muir*, Utah, 669 P.2d 440, 442 (1983), but ignores our statements rejecting this construction in *Capitano* and *Kincheloe*. See p. 1179, *supra*. The language of *Day's Market* does not support the Fund's position. In a nonaggravation case, no functional relationship between the current injury and the preexisting impairment is necessary to award compensation. The only issue under the amended statute in a nonaggravation case is whether the minimum percentages have been satisfied. Once satisfied, as in this case, the "substantially greater" test is met.

The Chief Justice's dissent states that the statute's "substantially greater" requirement is not satisfied by meeting one of the two alternative tests added by the 1981 amendments in the second paragraph of section 35-1-69(1). He would require, in addition, a finding of some causal or functional relationship between the industrial injury and the preexisting condition before compensation for the preexisting impairment can be ordered.

This position is founded upon *Day's Market* and the recent re-reading given our precedents in the Chief Justice's dissent in *Chavez v. Industrial Commission*, Utah, 709 P.2d 1168 (1985). However, in the present case the dissent has made no attempt to describe how the additional requirement of such a causal or functional relationship can be reconciled with the explicit language of the 1981 amendments. I suggest that any attempt to do so would fail for the simple reason that the legislature, like the Industrial Commission, has read our earlier cases as reducing the "substantially greater" requirement to nothing more than an additive test, requiring that all impairments be accumulated, without regard to whether they have any causal or functional relationship to the industrial injury. Only by viewing our cases and the statute in this way can we sensibly construe the 1981 amendments.

A document that has recently come to our attention, *A Sunset Audit of the Utah State Industrial Commission*, Report No. 84–12 of the Office of the Legislative Auditor General to the Utah State Legislature (Oct.1984) (hereinafter "Sunset Audit"), provides confirmation that the Commission views our cases as set forth in this opinion. Pursuant to the Utah sunset review legislation, the Legislative Auditor General considered the Industrial Commission and the legislation it administers, including the second injury fund law. The Industrial Commission has endorsed the resulting Sunset Audit. In its summary description of the present state of second injury fund law, the Audit states:

> The second injury fund statute specifies additional benefits that are inequitable. The Utah system has evolved to provide benefits for the personal loss felt by injured workers in addition to the compensation for lost wages originally intended. As a result, *the state Supreme Court now interprets the second injury fund statute to compensate the personal loss felt for any handicap that precedes the industrial accident.* We feel that these additional benefits are inequitable and do nothing to promote the fund's stated purpose of removing disincentives to hire the handicapped.

Sunset Audit at ii. (Emphasis added.)

The report itself describes some of the handicaps referred to in the summary as "such preexisting conditions as thirty-year-old deer hunting accidents, old football injuries, and psychological disorders; some have even attempted compensation for obesity and alcoholism...." Sunset Audit at 18. Although the Commission, like the Legislative Auditor General, apparently finds the results required by the statute as we have construed it to be unpalatable, it

has been following them, if the award in this case is any example.[2]

The dissent of the Chief Justice in *Chavez* reads into our earlier cases limitations on recovery which, I submit, can be found there only by creative hindsight. The reason for this attempt to limit recovery under our earlier cases is understandable. It has become apparent that the Commission, in implementing those decisions, has felt compelled to award compensation to those, such as Mr. Webb in the present case, who suffer from preexisting impairments entirely unrelated to their industrial injuries. An industrial injury can thus trigger compensation to an employee for a whole laundry list of infirmities that in no way worsened the industrially caused impairment.

Apparently the Legislative Auditor General and the Commission also agree that this policy is improvident. The Commission's actions, however, are plainly the result of a fair reading of both our prior decisions and the statute's vague language. The legislature, presumably relying upon the statutory interpretation reflected in our cases, already acted in 1981 by passing amendments aimed at limiting awards from the Second Injury Fund.

All this may be coming to a head with the Sunset Audit's recommendation, endorsed by the Commission, that the statute be even more sharply limited, if not repealed. The Audit asserts that the Fund, even with the 1981 amendments, no longer serves the purpose for which it was designed and that awards under the second injury fund statute are no longer consonant with the basic policy of the worker's compensation statutes which it was designed to complement.

Under those circumstances, matters have gone too far for this Court to attempt to remedy by judicial fiat problems created by what some see as an outdated statutory policy and by our earlier decisions attempt-

---

**2.** The Commission's agreement with the report and conclusions of the Sunset Audit is evidenced by a letter appended to it, dated October 12, 1984, and signed by all three commissioners. It states:

> We have reviewed the audit and are in agreement with the findings and recommen-

dations.... As you know, we have been working toward the accomplishment of the recommendations pertaining to the ... Second Injury Fund for some time but have been hampered by the factors stated in the audit report.

Sunset Audit app. (1984).

ing to implement the policy and to construe the statute's unclear language. The legislature has studied and acted upon the matter. It may act again in the future. We must respect its actions and leave with it the responsibility for further statutory changes. The legislature is certainly better suited than we to weigh policy considerations and to articulate new standards for the Commission to follow, especially when the statute with which we are faced is not a model of clarity. The best we can do is explain what we think the legislature has achieved through the amendments and then leave the matter in its hands for further action.

We affirm the order of the Commission for the reasons set forth in this opinion.

STEWART, HOWE and DURHAM, JJ., concur.

HALL, Chief Justice (dissenting):

I concur in the conclusion reached by the majority that the Commission erred in its determination that aggravation of any one preexisting incapacity requires compensation for all preexisting incapacities. However, for the basic reasons set forth in my dissent in *Chavez v. Industrial Commission*, Utah, 709 P.2d 1168 (1985), I do not join the majority in its holding that no functional relationship is necessary between the industrial incapacity and the preexisting incapacity in order to support an award of compensation.

The "substantially greater" requirement of section 35–1–69(1) remains intact following the 1981 amendments. Consequently, I would reverse the contrary order of the Commission.