Argued and submitted February 28, 1994; resubmitted In Banc June 8, affirmed
July 26, 1995

## STATE OF OREGON,
*Appellant,*

*v.*

## ROGELIO JUAREZ-GODINEZ,
*Respondent.*

(92C-21343; CA A78977)

900 P2d 1044

Timothy A. Sylwester, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Helen Lenore Cooper argued the cause for respondent. With her on the brief was Ferder, Ogdahl, Brandt & Casebeer.

DEITS, J.

Edmonds, J., dissenting.

## DEITS, J.

The state appeals from a pretrial order suppressing evidence seized pursuant to a search warrant. The warrant was issued on the basis of information obtained by the police during a traffic stop. We affirm.

We recite the facts, which are not disputed, as found by the trial court:

"The Defendant was stopped on October 13, 1992, at approximately 1:25 a.m. for what appeared to be a routine traffic stop for exceeding the maximum speed limit. The Defendant's vehicle did not stop immediately upon seeing Trooper Burdick's overhead lights, but did pull off at the first [exit] ramp that the vehicle came to. Upon making contact with the driver, Trooper Burdick noted that all of the occupants in the vehicle were hispanic, that the Defendant was the driver of the vehicle, and that there was a female passenger in the front passenger seat and a male passenger in the back seat behind the front passenger. Trooper Burdick also observed that there were numerous air fresheners in the vehicle and that there was no luggage visible in the vehicle. Trooper Burdick also noted that the occupants were nicely dressed and that the Defendant had 'salon styled hair.' When asked where they were going to, the occupants told Trooper Burdick that they were on their way home to Tacoma, that they had been visiting a relative in Eugene. When the driver was asked for his driver's license, he was not able to produce one and gave Trooper Burdick the name of Oscar Sanchez. When asked to produce the registration for the vehicle, the Defendant produced a temporary registration in the name of a person who was not present. When a computer check was done on the registered owner, Trooper Burdick was told that the registered owner was on parole. A computer check on the name of Oscar Sanchez revealed that there was an outstanding warrant for Oscar Alverez-Martinez, aka Oscar Sanchez, with a date of birth of September 28, 1971. Trooper Burdick then re-contacted the Defendant and advised him about the warrant. The Defendant then told Trooper Burdick that the Defendant's name was Oscar Sanchez-Sanchez and that he had never been arrested and was not the person described on the warrant. During this time, Trooper Lewis had arrived at the scene and primarily acted as backup for Trooper Burdick. Trooper Burdick also contacted dispatch and requested that Senior Trooper Milton and his canine, 'Bud,' respond to the scene. After discussing the outstanding warrant with the

Defendant, Trooper Burdick then placed the Defendant under arrest for failing to display a driver's license. Approximately 15 minutes had elapsed since the initial stop at this time. Defendant was handcuffed and placed in the rear of Trooper Burdick's patrol vehicle. Trooper Burdick then contacted the Defendant in the Trooper's patrol car and advised him that they were having a problem with people trafficking in narcotics on the highways, and Trooper Burdick asked the Defendant if the Defendant had any drugs, weapons or large amount of money in the Defendant's vehicle. The Defendant told Trooper Burdick that he did not. The Defendant refused several requests by the Trooper to search the vehicle. The occupants of the vehicle were not told they were free to leave, even though the female passenger had what appeared to be a valid Washington driver's license and the computer check on her revealed 'no wants.' The occupants of the vehicle never asked to leave, nor did they ask if they could drive the vehicle from the scene. Trooper Milton and his dog arrived at the scene at 2:11 a.m., approximately 46 minutes after the initial stop for the traffic violation. Trooper Milton contacted the driver of the car and was again refused consent to search the vehicle. Bud, the dog, was then allowed to sniff the outside of the vehicle and 'alerted' on the crack of the lower left corner of the passenger door. Trooper Milton determined that Bud was reacting to the odor of controlled substances. The occupants of the vehicle were again contacted and permission was requested to search the vehicle. The occupants again refused to grant consent to search the vehicle. The search warrant was subsequently obtained for the search of the vehicle based on the above information. Neither the Defendant, nor the occupants of the vehicle were informed that they were free to leave the scene of the stop until after the dog search was complete. Trooper Burdick testified that he could have impounded the vehicle prior to the dog search if he had not been able to verify with the registered owner that the occupants had permission to use the vehicle. He also testified that he did not attempt to contact the registered owner of the vehicle. Trooper Burdick also testified that he was not aware of any statute authorizing him to impound the vehicle, but that it was their office policy to do so if the registered owner could not be located to verify permission to use the vehicle."

Based on the evidence seized during the execution of the warrant, defendant and the two passengers were charged by indictment with three counts of unlawful delivery of a controlled substance. ORS 475.992. Defendant moved to

suppress the evidence on the ground that the search was "unconstitutional."[1] He argued that once he was arrested, the basis for the original stop had dissipated and, lacking reasonable grounds to believe that a crime had been committed, Burdick had no grounds to detain the vehicle and the passengers. He also argued that because the inquiry should have ended after defendant and the passengers refused to consent to a search, the subsequent 50-minute detention was unreasonably long. Finally, he argued that the use of Bud constituted a warrantless search that was not supported by either reasonable suspicion or probable cause. After a hearing on defendant's motion, the court reached the following conclusions, and suppressed the evidence:

> "Based on the above [findings], the Court finds that the detention of the Defendant's vehicle was unreasonable under the circumstances, and that the application of 'Bud' to the vehicle was overly intrusive and constituted a warrantless search."

On appeal, the state characterizes as the "threshold question * * * whether Trooper Burdick unlawfully 'detained' the vehicle defendant was driving * * * and, if so, whether that illegality provides any basis to suppress evidence." The state argues that the vehicle was not detained, but that even if it was detained, the detention was lawful.[2] The state also contends that the dog-sniff was not a search.

We first consider whether the trial court correctly concluded that the vehicle was detained unlawfully. Based on its findings, quoted above, the trial court concluded that "the detention of the Defendant's vehicle was unreasonable under the circumstances." The legal basis of the court's opinion is not entirely clear. The court may have been analogizing the situation to an investigatory "stop" of a person. Under ORS 131.615(1), an officer who reasonably suspects that a person has committed a crime may briefly detain that person to make a reasonable inquiry. The detention and inquiry, however,

---

[1] Neither defendant's motion nor the trial court's order cited any specific constitutional provisions; however, because we resolve the issue on state constitutional grounds, we need not consider the issue under the federal constitution.

[2] The state makes similar arguments regarding the alleged detention of the passengers. However, the trial court made no findings or conclusions as to that issue, nor do we believe that a discussion of their status is necessary to the disposition of this case.

may be for no longer than a reasonable time. ORS 131.615(2). Although some courts have applied that type of analysis to hold that brief detentions of personal property for investigatory purposes are lawful where the police have a reasonable suspicion that the property contains evidence of a crime, *see, e.g., United States v. Place*, 462 US 696, 103 S Ct 2647, 77 L Ed 2d 110 (1983) (holding that 90-minute detention of suitcase was excessive), we have not done so. Regardless, such an application of those statutes was never presented to the trial court, nor do the parties propose on appeal that we now adopt that approach.

 The trial court may have been holding, in essence, that the vehicle was seized unlawfully. If so, we do not agree that the vehicle was seized before the dog-sniff. A seizure occurs when there is a

> "significant interference with a person's possessory or ownership interests in property. The seizure of an article by the police and the retention of it (even temporarily) is a significant intrusion into a person's possessory interest in that 'effect.' " *State v. Owens*, 302 Or 196, 207, 729 P2d 524 (1986).

In evaluating whether there was a seizure of the vehicle here, we are bound by the trial court's findings of historical fact if evidence supports them. *Cf. Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

The state contends that the vehicle was not seized, but that it remained at the scene as an unavoidable consequence of defendant's arrest. *See State v. Woods*, 134 Or App 53, 894 P2d 511, *rev den* 321 Or 340 (1995) (request that passenger exit arrested driver's car was practical consequence of officer's need to tow car). Defendant argues that the vehicle was seized because of Burdick's specific actions and statements, and that that seizure was independent of defendant's arrest. After defendant and the passengers refused to consent to a search of the vehicle, Burdick did tell them that officer Milton was coming, that the dog was going to sniff the vehicle, and that, if the dog alerted, Burdick would apply for a search warrant. However, as the trial court found, defendant never asked that the vehicle be released, nor did the passengers, who were not under arrest, ask to leave with the vehicle. Further, Burdick testified that *had* defendant asked

that the vehicle be released, Burdick would have allowed a licensed driver to take it away, assuming the registered owner had been contacted and consented. Under these circumstances, the officer's actions *before* the dog-sniff occurred did not constitute a seizure of the vehicle. Accordingly, we conclude that the trial court erred in concluding that the vehicle was detained unlawfully.

■ The state next argues that the trial court erred in concluding that the dog-sniff inspection of the vehicle constituted a search. The state asserts that we should adopt the reasoning set forth in our decision in *State v. Slowikowski*, 87 Or App 677, 743 P2d 1126 (1987), *aff'd on other grounds* 307 Or 19, 761 P2d 1315 (1988). The essence of the state's argument is that the odor emanating from the vehicle announced its contents and, therefore, under the "plain smell" variant of the "plain view" doctrine, defendant had no cognizable privacy interest that was invaded. Defendant contends only that the purposive application of the dog to the vehicle constituted an unlawful warrantless search.

■■ Under Article I, section 9, a search occurs when the police invade a person's privacy interests. *State v. Nagel*, 320 Or 24, 29, 880 P2d 451 (1994); *Owens*, 302 Or at 206. To determine whether an asserted interest is protected under that provision, *i.e.*, whether particular police conduct is a search, we apply "an objective test of whether the government's conduct 'would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy.' " *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) (citation omitted); *see also Nagel*, 320 Or at 24. In *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988), the Supreme Court explained that a privacy interest under Article I, section 9,

> "is an interest in freedom from particular forms of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. A court has never held, for example, that a police officer engages in a search by making unaided observations from a public place, and an individual therefore cannot be said to have a constitutionally protected interest in freedom from such scrutiny."

■ It is undisputed that individuals have a privacy inter-
est in the contents of their vehicles. *See State v. Rhodes*, 315
Or 191, 196-97, 843 P2d 927 (1992). It is also clear, however,
that not all police actions that reveal those contents consti-
tute an "intrusion." *See, e.g., State v. Jackson*, 296 Or 430,
438, 677 P2d 21 (1984) (no intrusion to walk around vehicle
and look through its windows); *State v. Evans*, 101 Or App
340, 709 P2d 1177 (1990) (no intrusion to shine flashlight on
the defendant while he was in vehicle). The issue presented
here is whether having the dog sniff the vehicle that defen-
dant was driving intruded upon a protected privacy interest.[3]

 *Slowikowski* is the only Oregon case in which the
legality of a dog-sniff inspection has been directly addressed.
*See State v. Kosta*, 304 Or 549, 748 P2d 72 (1987) (because the
defendant articulated no basis for possessory or ownership
interest, court did not reach legality of detention and expo-
sure of package to narcotics detection dog); *State v. Dupay*, 62
Or App 798, 662 P2d 736, *rev den* 295 Or 541 (1983) (because
the defendant's bag was unlawfully seized, court did not
address whether the subsequent dog-sniff was a search). In
*Slowikowski*, the police were at a mini-storage facility to
conduct a training exercise with a marijuana-detecting dog.
When the dog unexpectedly alerted to the defendant's locker,
a narcotics investigator got down on his hands and knees and
detected a distinct odor of marijuana coming from the locker
door. On the basis of that information, a search warrant was
issued, and the ensuing search disclosed 20 pounds of mari-
juana. On appeal of his conviction for possession of a con-
trolled substance, the defendant argued that allowing the dog
to sniff his storage unit was a search and that the search
violated Article I, section 9, and the Fourth Amendment
because the police did not have a reasonable suspicion that
the unit contained contraband. The state argued that no
privacy interest was invaded and, thus, that there was no

---

[3] Although the dissent initially quotes the correct test for determining whether
police conduct rises to the level of a search under Article I, section 9, *see* 135 Or App at
610, it inexplicably proceeds to craft a new standard for the particular police conduct
at issue here. The dissent contends that "the question is whether the framers of
section 9 would have considered the use of a dog by police to sniff an odor under the
circumstances of this case to be [a search]." *Id.* at 612. Despite its citation to *Nagel*,
we find no authority in that case, or any other, for the dissent's novel application of
Article I, section 9.

search, because the defendant could not have had a reasonable expectation of privacy in the odor escaping from his storage unit.

Citing numerous federal and out-of-state cases decided under the Fourth Amendment, this court concluded that "because defendant had no reasonable expectation of privacy in the odor of marijuana escaping from his unit, the dog-sniff here was not a search." 87 Or App at 685. We also concluded that the facts of the case met "the requirements of the plain smell variant of the plain view doctrine." *Id.* (citing *State v. Bridewell*, 87 Or App 316, 742 P2d 648 (1987), *rev'd* 306 Or 231, 759 P2d 1054 (1988)).

The Supreme Court affirmed our decision, but on different grounds. *Slowikowski*, 307 Or at 27. The court first considered the discussion in *Owens*, 302 Or at 206, pertaining to containers that announce their contents:

> "When the police lawfully seize a container, they can thoroughly examine the container's exterior without violating any privacy interest of the owner or the person from whom the container was seized. For example, the police can observe, feel, smell, shake and weigh it. Furthermore, not all containers found by the police merit the same protection under Article I, section 9. *Some containers, those that by their very nature announce their contents (such as by touch or smell) do not support a cognizable privacy interest under Article I, section 9.* Transparent containers (such as clear plastic baggies or pill bottles) announce their contents. The contents of transparent containers are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container. Applying the doctrine of 'plain view' to transparent containers, we hold that no cognizable privacy interest inheres in their contents, and thus that transparent containers can be opened and their contents seized. No warrant is required for the opening and seizure of the contents of transparent containers or containers that otherwise announce their contents." *Slowikowski*, 307 Or at 24 (emphasis supplied).

The Supreme Court in *Slowikowski* concluded that the defendant's locker similarly announced its contents because "[t]he odor emanating from defendant's storage locker was readily detectable by Deputy Kennedy." *Id.* at 25. Had the officer discovered the odor without the dog, the court held, the

discovery would not have been a search. The only issue, then, was the significance of the fact that the officer did not smell the odor until after the dog directed his attention to it.

The court commented that because dogs have been used for similar purposes since long before the advent of either the state or federal constitutions, there might be a "historical exception" for such use of dogs.[4] *Id*. at 27. However, the court found it unnecessary to decide that question in the light of its conclusion that, because the dog-sniff was not a *purposive* intrusion into the defendant's privacy, the use of the dog was not a search. The court further concluded that the use of the dog did not convert the *officer's* close sniffing of the area outside of the locker into a search. It also noted that the fact that the officer's sniffing was purposive was not determinative: "The odors he detected were all entirely outside the locker, where anyone who tried could have detected them." *Id*. Notably, the court did not apply that reasoning to its analysis of the *dog's* sniffing.

In this case, the state contends that the reasoning expressed in our *Slowikowski* opinion still supports the conclusion that a dog-sniff inspection of a lawfully stopped vehicle is not a search. We disagree. In that opinion, we recognized that the defendant's argument under both Article I, section 9, and the Fourth Amendment was grounded on the reasonable expectation of privacy analysis enunciated in *Katz v. United States,* 389 US 347, 361, 88 S Ct 507, 19 L Ed 2d 576 (1967) (Harlan, J., concurring). 87 Or App at 680. Noting that the issue was one of first impression under Article I, section 9, we emphasized that the "overwhelming trend" among the courts, including the United States Supreme Court, was to find that the use of a trained dog to sniff property located in a

---

[4] That dictum appears to be the impetus for the dissent's lengthy discussion of the "historical precedent" of using dogs to smell odors that humans cannot detect, and its ultimate conclusion that, because of the historical precedent, the indiscriminate use of dogs by police to reveal the contents of sealed containers cannot be considered a search. However, we fail to see how that history aids our inquiry into whether the police conduct at issue intruded on a privacy interest protected under Article I, section 9. As discussed below, unlike the federal constitution, a search under Article I, section 9, is not defined by a reasonable expectation of privacy. For our purposes, then, it is immaterial that it was "common knowledge to the inhabitants of the Oregon Territory" that dogs were able to smell and react to odors that could not be detected by humans. 135 Or App at 612.

public place does not constitute a search.[5] *Id.* at 681-82. We cited more than 20 opinions decided by federal courts and by state courts under the federal constitution before concluding that the dog-sniff was not a search, on the ground that the defendant had "no reasonable expectation of privacy" in the odor escaping from his locker. Additionally, in reaching our conclusion that the defendant lacked a protectable privacy interest, we quoted with approval the California Supreme Court's conclusion that "one who secretes illegal narcotics in his suitcase has no *protectable* privacy interest in those narcotics." *People v. Mayberry*, 31 Cal 3d 335, 340, 182 Cal Rptr 617, 644 P2d 810 (1982) (emphasis in original), *quoted in Slowikowski*, 87 Or App at 684.

■ Since that opinion was issued, however, the Oregon Supreme Court has interpreted Article I, section 9, in a way that seriously undermines the foundation of our analysis in *Slowikowski*. First, the court has since recognized that a defendant may, in fact, have cognizable Article I, section 9, privacy and property interests in contraband. *Kosta*, 304 Or at 553. More significantly, however, the Supreme Court has unanimously rejected the phrase "reasonable expectation of privacy" to define searches under Article I, section 9. *Campbell*, 306 Or at 164. Instead, the rights protected under that provision "are defined not by the privacy one expects but by the privacy one has a *right* to expect from the government." *State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987) (emphasis supplied); *see also Nagel*, 320 Or at 29.

That distinction is significant in that it can lead to different conclusions as to the lawfulness of police conduct. In *United States v. Knotts*, 460 US 276, 103 S Ct 1081, 75 L Ed 2d 55 (1985), for example, the United States Supreme Court held that monitoring the location of a car by use of a radio transmitter is not a search under the Fourth Amendment, because society is not prepared to consider as reasonable an expectation of privacy in the movements of a car that is open to public view. In contrast, such conduct *is* a search under Article I, section 9, because "the practice, if engaged in wholly at the discretion of the government, will significantly impair

---

[5] *But see* cases cited below at n 10 (holding that dog-sniff investigations are state constitutional searches).

'the people's' freedom from scrutiny." *Campbell*, 306 Or at 171, 172.

Finally, and perhaps most importantly, we believe that the Supreme Court's analysis in *Slowikowski* raises serious questions about the applicability of the "plain smell" doctrine to odors that are *not* detectable by a human nose. In that case, there were *two* "sniff" investigations — one by the dog and one by the narcotics officer — but the court applied distinctly different analyses to each. As to the officer, the court applied a "plain smell" analysis to conclude that, because he was in a place where he had a right to be and because the odors he detected were entirely outside the locker, his conduct, despite its purposive nature, was not a search. 307 Or at 27.

The court could have reached the same conclusion with respect to the dog's inspection, because, as the court found, the dog, too, was lawfully on the premises and sniffed only the outside of the locker. However, in its discussion of the dog-sniff, the court made no mention whatsoever of the facts relevant to a "plain smell" analysis. Instead, and despite its recognition that "purposiveness" of action is not deter-minative as to whether a search has occurred, the court concluded that the dog's sniffing did not constitute a search because the dog did not *purposively* intrude into a protected area. *Id*. Thus, although the court did find that the locker "announced its contents," the only identified *recipients* of that announcement were the officers who were lawfully on the premises. *Id*. at 24. There is no suggestion in the opinion that the contents also were "announced" to the dog.

We conclude that the vehicle in this case did not announce its contents such that defendant lacked a cogni-zable privacy interest in those contents. In its most recent discussion of the privacy interests protected by Article I, section 9, the Supreme Court reiterated the statements it made in *Campbell*:

" 'One explanation for the absence of a constitutionally protected interest against certain forms of government scru-tiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized

freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom from scrutiny available to "the people." ' " *Nagel*, 320 Or at 30 n 5 (quoting *Campbell*, 306 Or at 157).

The government thus will not be said to have intruded on a person's "privacy" when the government's scrutiny is no different than what could have been done by any private individual. *Compare Wacker*, 317 Or at 419 (no privacy interests invaded when police observed the defendant carry out drug activities in a lighted car in a tavern parking lot during business hours) *with Nagel*, 320 Or at 31 (privacy interests invaded by administration of field sobriety tests, because the police "created a situation that exposed information about defendant that was otherwise not observable by the officer or by members of the general public") *and State v. Portrey*, 134 Or App 460, 896 P2d 7 (1995) (privacy interests invaded when police picked up and examined the soles of boots left in a box on the front porch of the defendant's apartment).[6] It follows, then, that the reason there is no cognizable Article I, section 9, privacy interest in a container that announces its contents is because the contents of such a container are plain to any individual who is present. *Owens*, 302 Or at 206; *see also State v. Nichol*, 55 Or App 162, 166, 637 P2d 625 (1981), *rev den* 292 Or 581, *cert den* 459 US 824 (1982) (odor of marijuana emanating from paper bag "revealed its contents as fully as if it had been made of clear, not opaque, material"). The fact that it is the government who discerns those contents, rather than a private citizen, does not, in and of itself, render that discovery intrusive.

In this case, and in marked contrast to the facts of *Slowikowski*, there is no suggestion that the odors "emanating" from the vehicle were so strong that "anyone who tried

___

[6] See also *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983), in which the Supreme Court considered whether the police invaded a protected privacy interest when they photographed the defendant exposing himself in his living room window:

"The question is when observation (or listening) becomes a 'search' within the legal meaning of that term. Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort. One would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises. An indecent exposure in a window opening to public view is not very different."

could have detected them." 307 Or at 27. In fact, the reason Burdick called the dog to the scene, and waited 50 minutes for the dog's arrival, was so the dog could inspect the vehicle's contents, contents that Burdick could not fully discern with his own senses. A container that emits an aroma that is beyond the range of the human sense of smell "announces" nothing. *See* Wayne R. LaFave, 1 *Search and Seizure* § 2.2(f) at 368 (2d ed 1987) ("As one commentator has rightly noted, 'application of a "plain smell" doctrine to dog searches * * * stretches the imagination' * * *.") (citation omitted). Accordingly, because defendant's vehicle did not "announce its contents," that theory cannot support the state's argument that defendant lacked a cognizable privacy interest in the contents of the vehicle.[7]

It is also important to note that this is not a case in which the police used a device to "enhance" their own perceptions. Unlike using a 135 mm lens, *State v. Louis*, 296 Or 57, 672 P2d 708 (1983), or a flashlight, *State v. Faulkner*, 102 Or App 417, 794 P2d 821, *rev den* 310 Or 422 (1990), allowing Bud to sniff the vehicle neither magnified, enhanced, nor improved the officers' senses, nor did it allow them to do more efficiently that which they could otherwise have accomplished with their own senses. In fact, at no time did the officers *ever* detect the contraband; their only indication of the vehicle's contents was the dog's actions. Bud's extraordinary sense of smell was used as a *substitute* for the officers' inferior senses, and it was that substitute that allowed the detection of something that was otherwise completely unexposed. *See* LaFave, 1 *Search and Seizure* § 2.2(f) at 368.[8] We thus conclude that, under these circumstances, the use of

---

[7] The dissent strongly implies that there can be no search without a physical intrusion into the vehicle. That, of course, is not the law, even under the less protective provisions of the Fourth Amendment. *See, e.g., Katz v. United States*, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967) (sound waves gathered by electronic surveillance equipment held to be search); *State v. Blacker*, 52 Or App 1077, 630 P2d 413 (1981) (telescopic scrutiny of objects inside home held to be search), *cited with approval in Louis*, 296 Or at 61.

[8] As noted by LaFave, the use of a trained dog is analogous to the use of a magnetometer to detect metal on a person or in an object. Courts have consistently held that the use of a magnetometer constitutes a search under the Fourth Amendment. LaFave, 1 *Search and Seizure* § 2.2(f) at 368, § 2.2(d) at 348-49.

Bud to reveal the contents of defendant's vehicle constituted a search under Article I, section 9.[9]

■ That conclusion, however, does not end our inquiry. The remaining issue is whether a dog-sniff search implicates the usual Article I, section 9, warrant requirements imposed on police searches. *See State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) (warrantless searches are *per se* unreasonable under Article I, section 9, unless police act within an established exception to warrant requirement). LaFave has addressed this issue in the context of the Fourth Amendment:

> "If the issue is framed in terms of whether a totally unrestrained use of such dogs in a dragnet fashion would be tolerable in a free society, one's answer might likely be no. If so, then under the test earlier suggested as appropriate under *Katz*, such use of trained dogs to detect concealed contraband should be held to constitute a Fourth Amendment search. Yet it is clear that this particular surveillance technique amounts to a relatively minor intrusion upon privacy, much less than is involved, say, in the physical entry and ransacking of a house in an effort to find a quantity of narcotics. Because this is so, and because the use of trained dogs is a valuable surveillance technique which would be considerably hampered if it could be utilized only upon full probable cause and with search warrant in hand, from this perspective the push is in the direction of a holding that the use of trained dogs to detect concealed contraband is not a search. This quite obviously leads to the question of whether there is some middle ground, that is, whether it is possible to subject this law enforcement practice to *some* restraints so as to ensure that it is not used in a dragnet fashion or in a

---

[9] The dissent states that our holding places us in the minority of jurisdictions that have considered the issue. 135 Or App at 615. Assuming that is correct, it may be because only a minority of jurisdictions analyze their state constitutional protections against unreasonable searches and seizures differently than the federal constitutional counterpart. In fact, of the eight cases cited by the dissent as being decided on state constitutional grounds, *id.* at n 5, five were actually decided under the Fourth Amendment, while the remaining three either adopted the federal rule without analysis or were otherwise based on a "reasonable expectation of privacy" standard.

It bears repeating that, under Article I, section 9, "[w]e must decide 'whether the practice, if engaged in wholly at the discretion of the government, will significantly impair "the people's" freedom from scrutiny.' " *Nagel*, 320 Or at 29 (quoting *Campbell*, 306 Or at 171). In essence, the dissent would hold that the police may conduct dog-sniff investigations at every traffic stop, may roam indiscriminately through the halls of public housing projects with trained dogs, and may use this crime detection device in any other context at random and without reason without significantly impairing "the people's" freedom from scrutiny.

random or unprincipled fashion, but yet not destroy its effectiveness by imposing *all* the limitations which are applicable to other, more traditional kinds of searches that are much more threatening to privacy and security." LaFave, 1 *Search and Seizure* § 2.1(e) at 315 (emphasis in original).

Among the state courts that have concluded that a dog-sniff is a state constitutional search, the trend is to find such a "middle ground" by holding such searches to a standard no more exacting than reasonable and articulable suspicion that the item to be searched contains contraband.[10]

In this case, however, we need not decide that issue. Even assuming that a reasonable and articulable suspicion of drug activity would be sufficient to justify a warrantless dog-sniff search of a lawfully stopped vehicle, the evidence does not support such a suspicion here. In his sworn affidavit for the search warrant, Burdick stated that he allowed Bud to sniff the vehicle based on his "reasonable suspicion that controlled substances were present in the vehicle":

> "From my training and experience, I noticed several characteristics displayed by the occupants of the vehicle that I know are often the same characteristics displayed by known narcotics traffickers. I noticed a heavy odor of air freshener in the vehicle. I did not see any luggage in the vehicle. I noticed that all occupants were wearing newly purchased clothing. The driver was wearing a gold necklace, a gold ring, and had salon-styled hair. A third-party [vehicle] registration is also very common with narcotics traffickers. I also know through my training and experience that Tacoma, Washington, [defendant's stated destination] is a frequent destination of narcotics traffickers."

---

[10] *See, e.g., McGahan v. State*, 807 P2d 506 (Alaska App 1991) (dog-sniff of warehouse exterior accessible to public was search requiring reasonable suspicion); *People v. Boylan*, 854 P2d 807 (Colo 1993) (dog-sniff of package at Federal Express office was search requiring reasonable suspicion); *State v. Torres*, 230 Conn 372, 645 A2d 529 (1994) (assuming without deciding that dog-sniff of car was a search, action warranted by reasonable and articulable suspicion); *State v. Pellicci*, 133 NH 523, 580 A2d 710 (1990) (dog-sniff of car's exterior was search requiring reasonable suspicion); *People v. Dunn*, 77 NY2d 19, 563 NYS2d 388, 564 NE2d 1054 (1990), *cert den sub nom Dunn v. New York*, 501 US 1219 (1991) (dog-sniff of residence from apartment hallway was search requiring reasonable suspicion); *Commonwealth v. Johnston*, 515 Pa 454, 530 A2d 74 (1987) (dog-sniff of rented storage locker was search requiring reasonable and articulable suspicion). *But see Commonwealth v. Martin*, 534 Pa 136, 626 A2d 556 (1993) (full probable cause and warrant required for dog-sniff of person).

Burdick also noted that the registered owner of the vehicle was on probation for a delivery of a controlled substance, that one of the passengers had an unconfirmed drug "offense,"[11] and that when defendant refused Burdick's request for consent to search the vehicle, defendant became "visibly nervous, turning pale, agitated, perspiring, and exhibited furtive eye movements."

We conclude that none of those observations, either individually or collectively, justify a reasonable suspicion that the vehicle contained controlled substances. In its discussion of "reasonable suspicion" in the context of an investigatory stop, ORS 131.615(1), the Supreme Court in *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977), held that an experienced police officer's instinct and experience cannot form the entire basis of reasonable suspicion. Thus, the court accorded no weight to the investigating officer's observations of "shined shoes, sharp clothes, neat 'Afro' haircuts, and people who stand and stare at officers." *Id*.

Applying that rationale here, a clean-smelling car containing three well-dressed occupants en route to Tacoma does not provide an objectively reasonable basis, whether by itself or added to the other factors, to suspect that the vehicle contained contraband. The lack of visible luggage also adds nothing, because, with three adults riding in the vehicle, any luggage would likely have been placed in the trunk. Finally, there is no objective quality to any of Burdick's other observations that would entitle them to any weight. The registered owner of the vehicle was not even at the scene, and the alleged drug "record" of the passenger was unspecified and unconfirmed.

We conclude that the warrantless search by the dog of the vehicle driven by defendant violated defendant's rights under Article I, section 9, and that the trial court did not err in suppressing the evidence obtained as a result of that search.

Affirmed.

---

[11] At the hearing, Burdick testified that the computer check revealed a record on the passenger's name for "some type of narcotics offense," but that such a "hit" does not necessarily indicate a conviction.

**EDMONDS J.,** dissenting.

The majority holds that the use of a dog to smell the odor of narcotics escaping from defendant's car constitutes an "unreasonable" search under Article I, section 9, of the Oregon Constitution. It reasons,

> "In fact, at no time did the officers *ever* detect the contraband; their only indication of the vehicle's contents was the dog's actions. [The dog's] extraordinary sense of smell was used as a *substitute* for the officer's inferior senses, and it was that substitute that allowed the detection of something that was otherwise unexposed. * * * We thus conclude that under these circumstances, the use of [the dog] to reveal the contents of defendant's vehicle constituted a search under Article I, section 9." 135 Or App at 604-05 (emphasis in original).

The majority's reasoning is erroneous. Under Article I, section 9, there is no significant privacy interest in odors that have escaped from containers in a parked automobile in a public place.

A "search" occurs when a person's privacy or possessory interests are invaded. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Not every "purposive action" by the police that intrudes into the life of a private citizen is a "search" under section 9. *State v. Slowikowski*, 307 Or 19, 27, 761 P2d 1315 (1988). Section 9 forbids only those intrusions which constitute "unreasonable searches and seizures." "The extent to which actions by state officials are governed by section 9 is defined by the general privacy interests of the 'people' rather than by the privacy interest of particular people." *State v. Tanner*, 304 Or 312, 320, 745 P2d 757 (1987). Thus, the Supreme Court explains,

> "A privacy interest, as that phrase is used in this court's Article I, section 9, opinions, is an interest in freedom from particular forms of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. * * *
>
> "Government scrutiny aside, individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping. One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of

scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom available to 'the people.' In contrast, both laws and social conventions have long recognized the right to exclude others from certain places deemed to be private. If the government were able to enter such places without constitutional restraint, 'the people's' freedom from scrutiny would be substantially impaired.

"Our intention is not to set forth a definition of a search based upon social and legal norms of behavior but to clarify the nature of the interest protected by Article I, section 9. Social and legal norms cannot govern the scope of the constitutional provision, which itself plays a substantial role in shaping those norms. But since 1859, when Article I, section 9, was adopted, the government's ability to scrutinize the affairs of 'the people' has been enhanced by technological and organizational developments that could not have been foreseen then. * * * In deciding whether government practices that make use of those developments are searches, we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9. In this context, it is appropriate to recall what this court said in *State v. Robertson*, 293 Or 402, 434, 649 P2d 569 (1982). 'Constitutional interpretation of broad clauses locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the initial principle.' " *State v. Campbell*, 306 Or 157, 170-71, 759 P2d 1040 (1988) (citations omitted).

In this case, defendant was lawfully arrested after being stopped on Interstate 5. When the police brought the dog to the scene, defendant's car was still parked alongside the freeway. In that sense, his privacy interest in the car was no different than had he parked the car in a shopping mall parking lot. Defendant never asked the officer to release the car to one of its passengers, nor did any of the passengers seek to drive the vehicle away. No search of any person or of items attached to a person occurred. There was never a physical

invasion by the dog or its handler into the interior of the car during the dog-sniff. The dog handler permitted the dog to sniff only around the exterior of the car. While sniffing, the dog "alerted" to the bottom portion of one of the passenger doors. Consequently, the police had the vehicle towed, and later, they obtained a search warrant to search its interior.[1] Unquestionably, had the officers been able to smell the odor of the narcotics while standing outside of the car parked along the freeway, there would have been no "search" within the meaning of section 9. In that instance, the odors that emitted from the interior of the car would have revealed their sources as fully as if the controlled substances had been visible from outside the car. *See Slowikowski*; *see also State v. Nichol*, 55 Or App 162, 166, 637 P2d 625 (1981).

Thus, the narrow issue is whether the use of a dog under these circumstances to smell an odor outside the vehicle that the officer could not detect makes what otherwise would not be a search, a "search." In *State v. Nagel*, 320 Or 24, 880 P2d 451 (1994), the court instructed,

> "In order to determine whether particular police conduct constitutes a search, 'we must look to the nature of the act asserted to be a search.' The test to determine whether police conduct rises to the level of a search is whether the government's conduct would 'significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy.' We must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the peoples' freedom from scrutiny." 320 Or at 29 (citations omitted).

The use of dogs to smell odors of controlled substances escaping from an object like an automobile is not like the use of a technological advancement such as a radio transmitter or a magnetometer used to detect metal on a person or in an object. Rather, the practice of the use of dogs to smell odors that humans cannot smell is an adaptation of the canine's natural sense of smell arising from law enforcement organizational developments to combat drug trafficking. In *People v. Price*, 78 AD2d 484, 434 NYS2d 834, *aff'd* 446 NYS2d 906 (1981),[2] the court noted,

---

[1] The subsequent search pursuant to the warrant uncovered 111 grams of cocaine, 50 grams of tar heroin and 3 1/2 pounds of marijuana in the car.

[2] The New York court held that no search occurred when a dog was used to sniff

"The historical precedent for utilizing the inherent qualities of canines is well chronicled. Dogs, endowed by nature with senses of smell and hearing superior to humans, have long been employed by police to detect crime and track criminals. Detection of contraband is a similar and related task which has led to the special training and successful use of dogs to assist exposing the criminal." 78 AD2d at 485.

A dog's sense of smell can be eight times stronger than a human's, and enables dogs to smell odors from a distance as far as 75 feet. John Schuster, *Constitutional Limitations of the Use of Canines to Detect Evidence of Crime*, 44 Fordam L Review 973, 986 (1976).

The use of dogs to detect odors of controlled substances began in this country in the 1940's as an "offshoot of the use of tracking dogs to apprehend fugitives and suspected criminals — an accepted practice in many jurisdictions." Max A. Hanson, *United States v. Solis, Have the Government's Supersniffers Come Down with a Case of Constitutional Nasal Congestion?*, 13 San Diego L Rev 410, 414 (1976). *See also* M. Harney and J. Cross, *The Narcotic Officer's Notebook* 297 (2d ed 1973). However, the use of dogs to smell odors or objects that humans could not smell is not of recent invention. Humans have relied on the dog's keen sense of smell for literally thousands of years. For instance, in the ancient Greek epic, *The Odyssey*, written in approximately 700 B.C., Homer describes the return of Odysseus to his home and family. Because Odysseus is disguised as a beggar, no one recognizes him except Argos, his devoted tracking hound. *See also Cynegeticus* (Greek treatise on hunting and dogs authored by Xenophone between 430 and 370 B.C.). In England and in this country from its earliest days, there is literature about the use of dogs to find objects and people by detecting the odor left behind when the object or the person

---

luggage at an airport. In *United States v. Place*, 462 US 696, 77 L Ed 2d 110, 103 S Ct 2637 (1983), the Supreme Court held that while the owner of luggage does have a reasonable expectation of privacy in the contents of his or her luggage, the exposure of the luggage to a dog-sniff is not so intrusive so as to constitute a "search" under the Fourth Amendment. In *State v. Kosta*, 304 Or 549, 748 P2d 72 (1987), police used a dog to sniff a detained package being delivered by Federal Express. The court held that because the defendant did not assert an identifiable interest in the package at the time of the detention of the package, it did not need to reach the issue in this case under section 9. *Id.* at 554.

was no longer discernible by humans. *See generally* 1 *Wigmore on Evidence* § 177 (3d ed 1940); J.C. McWhorter, *The Bloodhound as a Witness*, 54 Am L Rev 109, 114 (1920); *Annot.,* 18 ALR 3d 1221 (1968). For instance, in 1570, Dr. Johannes Caius wrote *Of Englishe Dogges*, and described how dogs were used to track lost cattle and horses as well as thieves. In this country, Native Americans were the first Americans to employ the dog's sense of smell. In 1755, Benjamin Franklin suggested using dogs as a defensive measure against Indian raids because they could be turned out to search surrounding woods for the scent of attackers. Downey, *History of Dogs for Defense* (1955). Similarly, Harriet Beacher Stowe's *Uncle Tom's Cabin* (1852), provides a graphic description of the use of dogs to track runaway slaves. When emigrants came to the Oregon Territory, they brought with them their hunting dogs trained to track scents.[3] In sum, the use of dogs to smell scents or odors invisible to humans has a lengthy historical precedent, and it cannot be disputed that the dog's ability to be trained to smell and to alert to a particular odor invisible to humans would have been common knowledge to the inhabitants of the Oregon Territory prior to statehood.

In the light of that knowledge, the question is whether the framers of section 9 would have considered the use of a dog by police to sniff an odor under the circumstances of this case to be "sufficiently" intrusive so as to "significantly" invade a privacy right. *Nagel*, 320 Or at 29. The majority answers that inquiry by reasoning that the "plain smell" doctrine is inapplicable because "[a] container that emits an aroma that is beyond the range of the human sense of smell 'announces' nothing," 135 Or App at 604, and

---

[3] In 1848, a well-known Oregon pioneer, Thomas Clark, came west on the Oregon Trail. In the spring of 1850, Clark took money that he and others had made mining gold east to buy cattle. By the spring of 1851, he had 65 Morgan mares and 63 Durham cattle ready to drive across the plains to Oregon. Clark, an Englishman, was also a hunter and a lover of hunting dogs, and brought with him hunting hounds. One day while on the trail, Clark's party was attacked by a band of Shoshone and Bannock Indians. Clark, hearing the shooting from a distance, launched a single-handed counterattack on horseback with his hounds. The Indians, believing that they were being attacked by a large party, fled. Bill Vandervert, as related to the Oregon Journal, November 22-23, 1922, and recounted in Fred Lockley, *Conversations with Bullwhackers, Muleskinners, Pioneers, Prospectors, '49ers, Indian Fighters, Trappers, Ex-Barkeepers, Authors, Preachers, Poets & Near Poets & All Sorts & Conditions of Men* (1981).

because it believes that our analysis in *State v. Slowikowski*, 87 Or App 677, 743 P2d 1126 (1987), is no longer persuasive in the light of the holding of the Supreme Court in *Campbell*, 135 Or App at 602. As will become evident in the discussion to follow, the majority's reasoning fails to properly focus the analysis on the "police action" in this case and whether in a historical context, that "action" was "sufficiently" intrusive to "significantly" invade a privacy interest of defendant.

Of course, the majority is correct that in our decision in *Slowikowski*, we used a "reasonable expectation of privacy" test which is no longer the proper test under Oregon law. Consequently, the Supreme Court used different reasoning to arrive at its result in *Slowikowski*, 307 Or at 27. However, that does not mean that the court believed that dog-sniffs violate section 9. In fact, the court expressly declined to reach the issue.[4] Moreover, the court's analysis in *Campbell* of its holding in *State v. Louis*, 296 Or 57, 672 P2d 708 (1983), suggests that a dog-sniff under the circumstances of this case does not violate section 9.

In *Louis*, the defendant exposed himself to public view through his living room window in his own home. The court held that he had no cognizable privacy right even though the police officers photographed him with a 135 mm camera lens from across the street. In *Campbell*, the court explained its reasoning in *Louis*. It pointed out that had the police entered the defendant's living room unlawfully to observe what could be observed from the street, an illegal search would have occurred. Thus, the determination of whether a search occurred did not depend on whether the defendant's body was exposed to public view, but whether the action of the police in viewing it could be characterized as a search. Because the police were in a place where they had a right to be when they observed the defendant and what they saw could be seen with the unaided eye, their actions did not constitute a search. *Campbell*, 306 Or at 167. Similarly, the

---

[4] The court said,

"[I]t may be that, inasmuch as dogs have been used for purposes analogous to the one for which Breaker was utilized since long before the advent of either the state or federal constitutions, there is an historical exception for such use of dogs, *i.e.,* such a use would not be a search. The question is interesting, but we need not answer it here." 307 Or at 26 (footnote omitted).

proper analysis here does not depend on whether humans could smell the odors from the car, but whether the use of a dog is so intrusive into defendant's privacy interest so as to constitute a search.

The "police action" in this case was to use a dog in a way that dogs have been used historically by law enforcement: to smell an odor that could not be smelled by humans. The odors from the controlled substances inside the car had escaped from the interior of the car. The dog and its handler were standing alongside a public highway where defendant's car was parked. No intrusion into the interior of the car occurred. Unquestionably, defendant had a privacy interest in the contents of his car, but the dog-sniff took place without any physical intrusion into those contents or the interior of the car. As the Supreme Court explained in *United States v. Place*, 462 US 696, 707, 77 L Ed 2d 110, 103 S Ct 2637 (1983):

> "A 'canine sniff' by a well-trained detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the technique discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subject to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods."

The conduct of the police in this case was no different in substance than any police action that historically used a dog to find a lost or concealed object or to track a fugitive to where he was hiding in an enclosed structure. In each situation, the police, with the use of a dog, detect an invisible odor left in a public area that leads to the location of the object or the person. The scent of the object or the person announces its presence even though neither is exposed to human perception. Here, the chemical odors of defendant's narcotics had escaped from his automobile into a public place where they were subject to scrutiny by the public. The odors were discernible without any physical intrusion into a private area, and

the dog handler was in a place where he had a right to be. Moreover, the use made of the dog under these circumstances did not violate any social or legal norm in effect at the time of the adoption of the constitution. There is nothing to indicate that citizens of the Oregon Territory would have considered the use of a dog by enforcement agents to detect the odor of an object emitting into a public place under the circumstances of this case to be offensive or to sufficiently impair any significant, cognizable privacy interest.

As a result of the majority's holding, Oregon finds itself in company with a minority of the jurisdictions that consider "dog-sniffs" of objects to be a "search."[5] The majority implies that it might hold differently if there had been a reasonable and articulable suspicion that the car contained narcotics before the dog was brought to the scene. That is an untenable suggestion under Oregon law. *See State v. Carter/ Grant*, 316 Or 6, 848 P2d 599 (1993) (holding that mere suspicions, no matter how reasonable, are insufficient to support the issuance of a search warrant under section 9).

In summary, the majority's analysis when extended to other potential factual circumstances is an "all or nothing" ruling concerning the legality of dog-sniffs for controlled substances in Oregon. The majority's dramatic change of Oregon law is ill-reasoned because it does not take into account the historical precedent of the use of dogs by law enforcement and because it fails to focus on the circumstances of the police action in this case. The fact that the odors

---

[5] The "dog-sniff" of a person or of effects on or near a person presents a different issue than a "dog-sniff" of an object insofar as privacy rights and the degree of intrusive action is concerned. *State v. Boyce*, 44 Wash App 724, 723 P2d 28 n 4 (1986). As to dog-sniffs of objects, the Ninth Circuit in *U.S. v. Lingenfelter*, 997 F2d 632 (9th Cir 1993), has held that a canine-sniff outside a drug suspect's commercial warehouse did not constitute a "search." Many state courts have held similarly under their own state constitutions. *See State v. Paredes*, 167 Ariz 609, 810 P2d 607, *rev den* (1991) (drug detection dog's alert to vehicle while standing outside vehicle near trunk did not constitute search); *People v. Salih*, 173 Cal App 3d 1009, 219 Cal Rptr 603 (1985), *rev den* (1986) (canine-sniff of mailed parcel not a search); *Cardwell v. State*, 482 So 2d 512 (Fla App 1986) (canine-sniff of vehicles at roadblock not a search); *State v. Snitkin*, 67 Haw 168, 681 P2d 980 (1984) (dog-sniff of a sealed container was not a search); *State v. Daly*, 14 Kan App 2d 310, 789 P2d 1203, *rev den* (1990) (subjecting luggage or packages to dog-sniff was not a search); *State v. Villanueva*, 110 NM 359, 796 P2d 252, *cert den* 110 NM 260 (1990) (dog-sniff of luggage not a search); *Strout v. State*, 688 SW2d 188 (Tex App 1985) (canine-sniff of safety deposit box not a search); *Boyce* (canine-sniff of safety deposit box was not a search).

from defendant's car were only detectible by a canine is of no constitutional significance because there was no physical intrusion of any private container and it cannot be reasonably said that the police action in this case violated social and legal norms. Defendant drove his car on a public highway while it contained narcotics, the odor of which escaped into the surrounding area. That odor, when detected by the dog from a public place, revealed the contents of the vehicle as fully as if the controlled substance had been visible from the exterior of the car. I would hold that the use of the dog under these circumstances to sniff the exterior of a parked automobile in a public place was not sufficiently intrusive so as to significantly invade defendant's privacy interests under Article I, section 9, of the Oregon Constitution.[6]

For these reasons, I dissent.

Riggs, J., joins in this dissent.

---

[6] The majority makes several unwarranted assertions about the breadth of this analysis. First, every case under section 9 is fact specific. Our holding should go no further than to determine the legality of a dog-sniff under the circumstances of this case. Second, although not controlling, whether a physical intrusion occurs will always be an aspect of whether a "search" has occurred. Our focus should be on the intrusiveness of the police action. Third, although other states employ different analysis regarding the use of dogs to detect narcotics, their rulings apply social norms concerning how privacy interests of the kind involved here are viewed. Under the majority's view, Oregon will be the first state to outlaw the use of dogs to detect narcotics unless a "reasonable suspicion" standard is subsequently adopted.