Argued and submitted March 8, 2011, reversed and remanded February 23, 2012

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## AMANDA KAYE SHIRK,
*Defendant-Appellant.*

Hood River County Circuit Court
070128CR; A142471

273 P3d 254

Joshua B. Crowther, Senior Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R.

Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Ortega, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.*

ORTEGA, P. J.

---

* Wollheim, J., *vice* Rosenblum, S. J.

## ORTEGA, P. J.

Defendant was found to have violated a condition of her probation—that she obey all laws—by endangering the welfare of a minor, based on evidence discovered after she consented to a search of her motel room. Defendant appeals, arguing that the trial court erred in denying her motion to suppress evidence. She contends that her consent to the search was invalid because it was preceded by her unlawful seizure, followed by an unlawful custodial interrogation. The state maintains that defendant was lawfully seized and that, although she was subjected to unlawful custodial interrogation, her consent to the search of the motel room was sufficiently attenuated from the illegality so that suppression is not required. Alternatively, the state asserts that the search was lawful under the emergency aid exception to the warrant requirement. As explained below, we conclude that defendant was unlawfully seized and interrogated, and that her consent was not attenuated from those illegalities. We also conclude that the emergency aid doctrine did not justify the search. Accordingly, we reverse and remand.

The facts are undisputed. In the early morning hours of February 4, 2008, Deputy Read learned that defendant and her boyfriend, Martinez, were staying at a motel in Wood Village and that there was an outstanding warrant for Martinez's arrest. Read had previously investigated the death of one of defendant's children and knew that several years earlier, after using methamphetamine, defendant had fallen asleep with her baby next to her, had rolled over, and had smothered the baby.[1] Read recalled that defendant and Martinez were romantically involved at the time of the baby's death.

Read and two other officers, Mallory and O'Dell, went to defendant's motel room and knocked on the door. A fourth officer, Cortada, waited outside the motel. Defendant called out that she was getting dressed and then opened the

---

[1] The probation in this case, in fact, was imposed as a result of that incident. Defendant pleaded guilty to criminally negligent homicide and was sentenced to three years of probation. As explained below, however, there is no indication in the record that Read knew of defendant's probationary status when the events at issue here occurred.

door. Mallory asked defendant who else was in the room. She responded that her baby was on the bed along with the "baby's daddy." Read looked in the room and could see Martinez and a baby on the bed. The officers proceeded to enter the room to take Martinez into custody. Martinez, who was in his underwear, got dressed, and the officers took him into the hallway. The officers searched Martinez and found in his pocket a glass pipe with what appeared to be methamphetamine residue on it. O'Dell took Martinez outside and put him in a patrol car.

At that point, Mallory asked defendant, who was standing in the hallway in front of the motel room door, if there were any drugs or contraband in the room. Defendant responded that there were not. Mallory asked her if she knew that Martinez had a methamphetamine pipe on him. She responded that she did not know. He then asked her "if it was possible that if she didn't know that Martinez had a meth pipe on him, could it be possible that she didn't know that there was meth in the room as well." She acknowledged that it was possible that there might be methamphetamine in the room of which she was unaware. Mallory suggested to defendant that there could be methamphetamine in the room in the bed with the baby, and informed her that he could apply for a search warrant based on the information that he had so far. "All [he] wanted to do," he said, was to "make sure the baby was okay and that there were no other drugs in the room."

Defendant, concerned about Martinez going to jail, told Mallory that there was no arrest warrant for Martinez and that he should not be going to jail. Mallory continued to focus on the possibility that there were drugs in the room, telling defendant, "[Martinez] had a meth pipe on him. There might be meth in the room. Your baby could be in danger, and so we need to kind of focus on that and kind of get off Mr. Martinez." Defendant became increasingly agitated. According to Read, defendant "didn't want to let us in the room. That was—that was the thing. She tried to shut the door on us." When defendant reached for the door in an attempt to pull it shut, Mallory grabbed defendant's arm and pulled her across the hallway away from the door so that she couldn't shut it. Read grabbed her other arm, and the two

officers pushed her against the opposite wall, held her there while they handcuffed her, and then pulled her to a seated position on the floor.

Mallory went outside to talk to his sergeant, who had arrived on the scene. As he was walking outside, Cortada came into the hallway. Read told defendant that he had worked on the case involving her dead child and defendant responded with outrage, yelling, "How dare you bring that up. I've paid my debt to society." Read then went to his patrol car to retrieve a "consent to search" form.

Cortada began engaging defendant in what he described as "small talk" in an attempt to "de-escalate things." He asked her when she had last used drugs, and defendant answered that she had used methamphetamine the previous week. Cortada also asked defendant if she would sign a consent form allowing the officers to search the motel room, and she said that she would.

After talking to his sergeant, Mallory returned to the motel hallway about five minutes after going outside. Cortada reported that defendant was willing to sign the consent form, which stated as follows:

"Before any search is done you should understand your rights:

"You have the right to refuse consent to a search.

"Anything found in the search can be used as evidence of a crime or seized for civil forfeiture.

"Understanding the above rights, I give consent to a search of the motel described as: Room 212[,] including all closed containers and compartments therein for evidence of the crime(s) of Possession, Distribution and/or Manufacture of a Controlled Substance and for evidence of any other crimes."

One of the officers read the form to defendant. She was taken out of the handcuffs, and she signed the form.

The officers entered the motel room and allowed defendant to pick up the baby and take him to the hall, where she waited for them to finish. In the ensuing search, the officers found a digital scale under the mattress and a knife on

the floor near the bed. Cortada testified that, after they allowed defendant to enter the room to retrieve the baby, he "noticed it was kind of odd when she picked up the baby because the baby was on the bed sleeping * * * and she kind of straddled him odd—in an odd fashion. * * * I thought there could have been something that she was trying to hide." No drugs were found during the search of the motel room. The baby was not searched. After concluding the search, the officers left defendant and the baby in the motel room and defendant was neither cited nor arrested. The entire encounter—from the time that the officers first contacted defendant until they left—lasted between 25 and 30 minutes.

In this probation violation proceeding, the state alleged that defendant had violated her probation by consuming illegal controlled substances and by violating the law. With respect to the latter, the state contended that defendant had violated ORS 163.575(1)(b), which prohibits endangering the welfare of a minor by knowingly permitting "a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted," and ORS 167.222, which prohibits "frequenting a place where controlled substances are used."

Defendant filed a motion to suppress evidence of the statements she made to the police at the motel after being handcuffed as well as the evidence seized in the search of the motel room. She argued that she was illegally seized without probable cause and that her statements and her consent to the search were products of that illegal seizure. She also argued that her statements and her consent were the direct result of custodial interrogation without the benefit of *Miranda* warnings.

The trial court granted the motion as to defendant's statements, concluding that she had made them under compelling circumstances without having received *Miranda* warnings. However, the court denied the motion with respect to the evidence found in the search of the motel room. The court ruled that the unlawful questioning did not taint defendant's consent to the search of the motel room. It noted that, while being questioned by Cortada, defendant had not said anything incriminating as to what had occurred in the motel

room and, furthermore, she was specifically informed that she had the right to refuse consent. As a second justification for denying the motion as to the evidence found in the motel room, the court ruled that the officers' entry into and search of the room was permissible under the emergency aid doctrine.[2]

Ultimately, the court concluded that the state had failed to prove that defendant had frequented a place where controlled substances were used, but it found that she had violated her probation by endangering the welfare of a minor. It entered a judgment extending her probation by three years.

On appeal, defendant renews her argument that her consent was not valid because it was not sufficiently attenuated from the unlawful seizure and the unlawful interrogation. She also argues that the emergency aid doctrine does not apply under the circumstances presented here. The state responds initially with an argument that was not made in the trial court—that defendant was lawfully seized because the officers had probable cause to believe that she had violated the "obey all laws" probation condition by endangering the welfare of a minor. The state further asserts that defendant's consent was attenuated from the unlawful questioning and that, in any event, the emergency aid doctrine permitted the officers to search the motel room. As explained below, we conclude that defendant's consent was not attenuated from the unlawful conduct, that the emergency aid doctrine did not justify the search, and therefore that the evidence found in defendant's motel room should have been suppressed.

The ultimate question before us is whether the officers lawfully entered and searched defendant's motel room. Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution both

---

[2] As explained in more detail below, the trial court did not expressly address defendant's argument that she had been seized unlawfully when the officers pulled her across the hall and handcuffed her. Given that the state maintained throughout the hearing that defendant was not seized, was not under arrest, and was not being investigated for any crime throughout the entire encounter (and none of the officers testified that they had probable cause or reasonable suspicion that defendant had committed any crime), it is not surprising that the trial court did not make a ruling as to whether probable cause justified defendant's detention.

prohibit unreasonable searches and, under both constitutions, a warrantless search is unreasonable unless it falls within one of the well-established exceptions to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). Consent is one such exception. *Id.* A defendant's consent to a search is not valid, however, if it derived from a prior violation of the defendant's constitutional rights. *State v. Hall*, 339 Or 7, 21, 115 P3d 908 (2005).

As noted, defendant argues that her consent derived from her unlawful detention and questioning. The state does not challenge the trial court's conclusion that defendant was subjected to custodial interrogation without having received *Miranda* warnings and, thus, that the interrogation was unlawful. Rather, the state maintains that defendant was lawfully seized and that there was no "factual nexus" between the unlawful questioning and her later consent, or, alternatively, if there was a factual nexus, the consent was attenuated from the illegality.

We turn first to the question of whether defendant was unlawfully seized. As noted, the state maintains for the first time on appeal that, although defendant was seized, that seizure was justified because the officers had probable cause to believe that she had violated her probation. That argument is directly contrary to the argument that the state made in the trial court. There, in the context of arguing that there was no "custodial interrogation" because there was no "custody," the prosecutor argued that defendant merely was "temporarily restrained," that she was "not under arrest," and that "nobody at any time testified here today or expressed then that this was a criminal investigation of [defendant]." In support of that contention, the prosecutor observed that the officers had, in fact, not cited or arrested defendant for anything after searching her room. Moreover, not only did none of the officers testify that they were investigating defendant for endangering the welfare of a minor; the record does not indicate that any of them even knew that she was on probation and, thus, the state's argument that they had probable cause to arrest her for a probation violation is unsupported. Given the state's legal argument below and, more importantly, the lack of any support in the evidentiary record that the officers had subjective probable cause to

arrest defendant, we conclude that the state's argument must fail.

For purposes of Article I, section 9, of the Oregon Constitution, probable cause requires that "[a]n *officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure,* and this belief must be objectively reasonable in the circumstances." *State v. Owens,* 302 Or 196, 204, 729 P2d 524 (1986) (emphasis added). The court has explained that the officer need not be legally correct in his or her understanding of probable cause and that "[s]ubsequent validation of the officers subjective belief as to the existence of probable cause to arrest is irrelevant to the inquiry." *State v. Vasquez-Villagomez,* 346 Or 12, 23, 203 P3d 193 (2009); *see also State v. Miller,* 345 Or 176, 184-85, 191 P3d 651 (2008) ("the officer may be mistaken about the basis or the extent of the restraint"). Thus, while the test for probable cause does not require that an officer must have a correct or nuanced understanding of the legal principles involved, it does require that the officer actually *have* a subjective belief "that a crime has been committed and thus that a person or thing is subject to seizure." *Owens,* 302 Or at 204. Here, we need not reach the second portion of the probable cause inquiry (that is, whether the officers' subjective belief was objectively reasonable) given that the first prong of the probable cause test (subjective belief) is not satisfied.[3] None of the officers involved in defendant's detention evinced a belief that she had committed a crime and thus was subject to seizure on that basis. Rather, they testified consistently with the prosecutor's argument that they were merely temporarily detaining defendant and that she was not the subject of a criminal investigation.

---

[3] In arguing that the trial court did, in fact, address probable cause, the state points to a comment made by the court that "it *could be* established in the context of a probation violation that there was a probability of law violation. Specifically, that [defendant] permitted a person under the age of 18 * * * to enter and remain in a place where unlawful activity involving controlled substances was maintained." (Emphasis added.) However, the court did not make that statement in the context of ruling on the lawfulness of the detention and, moreover, were we to read it in such a way and assume that the trial court meant that probable cause justified the seizure of defendant, we would have to conclude that the trial court was incorrect, given that there is no evidence of subjective probable cause.

As noted, the state does not take issue with the trial court's conclusion that defendant was subjected to unlawful custodial interrogation. Accordingly, the issue before us is whether defendant's consent to the search of the motel room was tainted by the illegal detention followed by the illegal interrogation.

In determining whether evidence is subject to exclusion as a product of a prior police illegality, the burden is initially on the defendant to establish "the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct * * *." *Hall*, 339 Or at 25. If the defendant makes that showing, the burden shifts to the state to establish that the disputed evidence is nonetheless admissible, by showing that it would inevitably have been discovered, that it was obtained independently of the prior illegality, or that the illegality has such a tenuous factual link to the evidence that the illegality cannot properly be viewed as the source of the evidence. *Id.*

Here, the state argues that there is no causal connection between Cortada questioning defendant about her drug use and her decision to consent to the search. In the state's view, defendant's statement that she had used methamphetamine the previous week did not implicate her with respect to the presence of anything illegal in the motel room at that time and, thus, it did not prompt Cortada to ask her for consent to a search of the room. Even if there is a minimal factual nexus, the state contends, the link was too tenuous to justify suppression of the items found in the search. We disagree.

The causal connection here involves not only Cortada's custodial interrogation but the fact that it occurred while the unlawful detention of defendant was ongoing. In *State v. Ayles*, 348 Or 622, 631-32, 237 P3d 805 (2010), the court addressed a similar issue:

"During defendant's unlawful seizure, defendant was not free to leave. The unlawful police conduct thus made defendant available to [the officer] for questioning. Although the state asserts that, as a practical matter, defendant would have remained at the scene regardless of the illegal seizure

> \* \* \*, the state has pointed to no evidence in the record that defendant would not have left had he not been illegally detained. \* \* \* But our point is an even more fundamental one: Whether or not defendant would have asserted his personal liberty and left the scene once his identification was returned to him, we cannot conclude that the illegal seizure of defendant, *while it was ongoing*, had no factual nexus to defendant's decision to consent."

(Emphasis in original.) We reach a similar conclusion here. Defendant's consent was obtained while the illegality was ongoing. Thus, defendant demonstrated an adequate factual nexus between the illegality and the consent.

Accordingly, the burden shifted to the state to demonstrate that the illegality had "such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence." *Hall*, 339 Or at 25.[4] Several considerations are relevant to that determination, including:

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct."

*Id.* In this case, the temporal proximity consideration favors defendant; the consent was obtained *during* the ongoing illegal detention and in very close temporal proximity with the unlawful questioning. The state does not suggest the existence of any intervening circumstances. Rather, the state asserts that the reading of the consent form to defendant, which contained the sentence: "You have the right to refuse consent to a search," satisfies the third criterion listed in *Hall*.

---

[4] The state alternatively may show "that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9" or "(2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 25. The state does not make any inevitable discovery or independent source arguments in this case.

We do not agree that the reference in *Hall* to the example of "a police officer informing the defendant of the right to refuse consent" amounts to a ruling that, as a matter of law, in every case where the state establishes that a defendant was informed of a right to refuse consent, the state has established the requisite attenuation. Rather, as the court emphasized in *Ayles*, the "totality of the circumstances" test is more nuanced than that. In *Ayles*, as in this case, the defendant was unlawfully seized and, during that unlawful seizure, consented to a search. *Unlike* the present case, though, the defendant in *Ayles* was given *Miranda* warnings. The court acknowledged that, as it had earlier indicated in *State v. Thompkin*, 341 Or 368, 380, 143 P3d 530 (2006), "*Miranda* warnings could, in fact, be an intervening circumstance adequate to break the causal chain between the defendant's statements and the prior illegality." *Ayles*, 348 Or at 635. In examining the "totality of the circumstances," the court held that the giving of the warnings did not sufficiently attenuate the consent from the illegality. *Id*. In particular, the court noted that the prior illegality (a search of the defendant) had produced incriminating evidence, which had triggered the arrest and the giving of the *Miranda* warnings. *Id*. at 637.

Here, too, the prior illegality had produced incriminating evidence; as noted, the trial court had suppressed defendant's statements, made during the custodial interrogation, about her drug use. Moreover, in the totality of the circumstances, several other factors merit consideration here. The record in this case demonstrates that the reason that defendant was seized was because she was trying to prevent the officers from accessing her motel room. Thus, by her actions, she already had refused to consent to a search of the room. It was that refusal—her attempts to keep the officers from entering the room—that prompted the officers to unlawfully detain and handcuff her. The officers gave no indication that that unlawful detention and handcuffing would come to an end regardless of whether or not defendant consented to the search. Rather, defendant would have had every reason to believe that she was being detained because she had attempted to keep the officers out of the room and that she could end her detention only by consenting to a

search of the room. In fact, that is exactly what she did. In these particular circumstances, reading a statement informing defendant of her "right to refuse consent" in order to obtain her consent to a search while being unlawfully detained for having refused such consent earlier, and immediately after an unlawful interrogation, does not purge the taint of the prior illegality.

The question, then, comes down to whether the trial court correctly determined that the search was justified under the emergency aid exception to the warrant requirement. The trial court ruled:

> "I do find that there was an emergency running, a concern with respect to the welfare of the minor based on [defendant's] history. The methamphetamine found on Mr. Martinez's person and the probability that he had not [sic] been in the bed with the child at least in the very vicinity of the child. And that also the—[defendant's] entry into the room did not terminate a reasonable belief the child was at risk because the methamphetamine on the person of Mr. Martinez, a knife seen on the floor near the bed, and the furtive manner in which she picked up the child off the bed, which would indicate—could indicate to someone that there was something going that [defendant] did not want the officers to see, and that we already had a circumstance that was involving methamphetamine in the proximity of the child."

Defendant contends that the emergency aid doctrine is inapplicable here because there was no emergency. As explained below, we agree.

The emergency aid doctrine applies when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary either to render immediate aid to persons or to assist persons who have suffered or are imminently threatened with suffering serious physical injury or harm. *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011). As noted, the trial court recited several factors in support of its conclusion that the emergency aid doctrine authorized the officers' entry into defendant's motel room: (1) defendant's history, which we understand to be a reference to the fact that she had negligently smothered a baby in the past; (2) the pipe with what appeared to be drug residue in it that had been found in Martinez's pocket when

he was taken into custody; (3) the officer's knowledge that Martinez had been on the same bed where the baby was; (4) a knife on the floor of the room; (5) the odd manner in which defendant picked up the baby from the bed. The last two factors, however, are not relevant to whether the emergency aid doctrine justified *entry* into the room, because both involved things the officers observed after they entered.[5] Thus, the question reduces to whether the first three factors justified a finding that a "true emergency" existed requiring the officers to render "immediate" aid to the baby because of reason to believe that he "ha[d] suffered, or who [was] imminently threatened with suffering, serious physical injury or harm." *Id.*

We begin by noting that the officers' knowledge that a person in the room with a child has previously negligently killed a child is not enough to establish the existence of an imminent threat to the child. Here, the additional circumstances likewise were not enough to give rise to an imminent threat. When defendant opened the door in response to the officers knocking, the officers observed no sign that either she or Martinez were under the influence of drugs. They observed the baby on the bed, but there is no indication that they observed signs that the baby was in distress or was in any immediate danger. Even allowing that Read may have been upset to discover defendant with another baby after the incident with her prior child, none of the circumstances that had accompanied the previous child's death were present at the time of the disputed entry into defendant's motel room. Bluntly, there was no evidence that this baby was in immediate danger of being smothered by defendant while she was under the influence of methamphetamine, because there was no evidence that defendant was under the influence of methamphetamine.

We do not understand the state to be suggesting otherwise. Rather, the state focuses on the fact that a pipe containing what appeared to be drug residue was found in pants that had been in the same room where the baby was

---

[5] Although the officers had previously been in the room to arrest Martinez—an entry whose lawfulness is not at issue here—the record reveals that they did not observe the knife on the floor until their second entry into the room.

located and suggests that the entry was necessary "to make sure that the baby was not being exposed to methamphetamine." According to the state, the presence of the pipe in the room suggests "that there may have been methamphetamine in the room and the child may have been in close proximity to it." We do not agree with the state's suggestion that evidence that a child is in a location where the police know that an item of drug paraphernalia was earlier located necessarily creates the type of "emergency" that justifies a warrantless entry. Here, when Martinez was on the bed where the baby was located, he was wearing his underwear. He donned the clothing where the pipe later was found only after the officers arrived to arrest him. Those facts do not provide a basis for a belief that the pipe had been in the bed with the baby; much less that methamphetamine was in the bed with the baby. Indeed, the officers had already been in the room and had observed no signs of methamphetamine use, no signs of anything dangerous near the baby, and no signs that there was anything wrong with the baby. In these circumstances, there was no "true emergency."

Reversed and remanded.