Argued and submitted August 31, 2011, reversed and remanded July 11, 2012

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**ANGELA RAE BERTSCH,**
*Defendant-Appellant.*

Deschutes County Circuit Court
07FE1713AB; A143880

284 P3d 502

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.*

_____

* Brewer, J., *vice* Rosenblum, S. J.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction for possession of methamphetamine, ORS 475.894. She assigns error to the trial court's denial of her motion to suppress evidence discovered during a traffic stop in which she consented to a search of her car. Defendant argues that the police unlawfully extended the traffic stop and that her consent was the unattenuated product of that illegality. The state responds that reasonable suspicion justified the extension of the traffic stop. Alternatively, the state argues that defendant's consent was sufficiently attenuated from the unlawful police conduct and, thus, the evidence was admissible. On review for errors of law, we conclude that the evidence should have been suppressed and, therefore, reverse and remand.

We state the facts consistently with the trial court's express and implied findings where there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Sergeant Husband of the Deschutes County Sheriff's Office received information through a "reliable informant" that a wanted individual, Kara Williams, was frequenting two apartments at the Bend Riverside apartment complex. Husband also learned that drugs were allegedly being used and sold out of those two apartments. Consequently, Husband "responded to that location" in plainclothes and an unmarked car and conducted surveillance of the two apartments. He observed defendant and Sanders—a person that, according to Husband, associated with drug users and dealers—enter one of the apartments and leave a short time later. Defendant matched the description of Kara Williams.

Defendant and Sanders got into defendant's car and drove away. Husband followed. Shortly after leaving the apartment complex, he observed defendant proceed straight through an intersection from a right-turn-only lane. He radioed dispatch to request that a marked vehicle make a traffic stop for the infraction and investigate whether defendant was Kara Williams. Two officers—Beck and Ryan—responded in separate vehicles and initiated a traffic stop. Defendant, Beck, and Ryan pulled into a parking lot, and Husband pulled in behind them. Beck approached defendant on the driver's side of the car while

Ryan approached Sanders on the passenger side. The officers obtained defendant's and Sander's identifications and ran records checks. Dispatch notified the officers that defendant had a suspended license and that Sanders had an outstanding misdemeanor warrant. However, Beck determined that defendant was not Kara Williams. At that point, Beck "turned the stop over to" Husband, giving him defendant's driver's license. At least one of the other officers remained on the scene and continued to question Sanders. Additional officers also arrived.[1]

According to Husband, "once I realized that it was not Ms. Williams in the vehicle, I made contact with [defendant] to discuss the reasons and the occurrences around the apartment complex and specifically the apartment that *** there was drug trafficking and drug use associated with." Husband approached the car, advised defendant of the reasons for the stop, and asked defendant to "step out of the vehicle," which she did.[2] Husband told defendant that he had received credible information that the "apartment that she had been associated with, gone in and out of, was associated with drug use and drug trafficking." He then asked her if she was currently on probation. Defendant responded that she had recently completed probation in a different county for possession of a controlled substance. Husband inquired whether there were drugs or weapons in the car. Defendant denied that there were. Husband then requested consent to search defendant's car. Defendant asked if she had a right to refuse consent, and Husband replied that "she had the right to say no." A conversation ensued, the substance of which was disputed.[3]

---

[1] At the suppression hearing, Husband initially testified that additional officers and police vehicles may have arrived during the stop. (Husband had called for additional backup prior to the traffic stop.) His testimony later in the hearing acknowledged that additional officers, including a K-9 unit, did arrive at the scene at some point during the stop. Defendant testified that several additional police vehicles were on the scene, including a K-9 unit.

[2] Husband testified that defendant was not free to leave.

[3] Husband testified that, although he could not specifically recall his exchange with defendant, he likely asked (consistently with his typical approach in that circumstance), "If *** there's no controlled substances in your vehicle, or weapons, would there be a reason for you not to consent to a search?" According to defendant, Husband indicated that, if consent were refused, he would impound the vehicle and search it anyway.

Husband ultimately sought consent a second time and defendant consented to a search of the vehicle.

During the search, Husband found a methamphetamine pipe in defendant's purse, which had been left in the vehicle. After the search was completed, defendant's license was returned and she was allowed to leave. Her car was left at the scene. There is no evidence that any citation was issued.

Defendant was subsequently charged with possession of methamphetamine. Before trial, she moved to suppress the evidence obtained during the search of her car on the ground that it was the product of an unlawful extension of the traffic stop in violation of Article I, section 9, of the Oregon Constitution. The state did not dispute that the stop had been extended but, instead, argued that the extension was supported by reasonable suspicion and therefore was lawful: "[A]lthough Defendant was stopped for a traffic violation, * * * Husband articulated ample additional reasonable suspicion of criminal activity to justify his extension of the stop * * *." After a hearing, the trial court issued an order denying defendant's motion:

> "This Court adopts the testimony of witnesses as its findings of fact.[4] Defendant had been observed at a high drug traffic apartment complex. She came out of an apartment that was specifically known to be a location where drug trafficking and consumption took place. The passenger in her car was known to associate with drug dealers. The police had reasonable suspicion to detain Defendant, make inquiry unrelated to the initial traffic stop, and ask for consent to search."

Defendant entered a conditional guilty plea, reserving her right to appeal the denial of her motion to suppress.

On appeal, defendant renews her argument that the traffic stop was unlawfully extended and that her consent was the product of that unlawful seizure. The state responds that the officer reasonably suspected that defendant possessed drugs and that, in any event, defendant's consent was attenuated from any unlawful police conduct.

---

[4] The court made no attempt to resolve factual inconsistencies in the witnesses' testimony.

Specifically, the state argues that Husband's statement to defendant that she had a right to refuse consent mitigated the effect of the unlawful seizure.[5]

The extension of a traffic stop beyond an investigation into a traffic violation is unlawful unless it is supported by reasonable suspicion of criminal activity. *State v. Huggett*, 228 Or App 569, 574, 209 P3d 385 (2009), *rev dismissed*, 348 Or 71 (2010); *see also State v. Rodgers/Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010) ("[C]onduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation." (Emphasis in original.)). A law enforcement officer has reasonable suspicion to temporarily detain a person if the officer is "able to point to specific and articulable facts, interpreted in the light of the existing circumstances and his experience," that the person has committed or is about to commit a crime.[6] *State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011).

Here, the state points to the following facts: (1) defendant was observed visiting an apartment suspected of drug activity; (2) defendant left the apartment after only a short time; and (3) defendant was accompanied by a person who was known to associate with drug users and dealers. At the hearing on defendant's motion to suppress, Husband testified that he had also relied on the fact that defendant had recently completed probation for a drug offense because, based on his "training and experience,"

_____

[5] The state also argues, as an alternative basis for affirmance, that the officer did not extend the stop because the officer was investigating defendant for driving while suspended. The record does not appear to support that contention and, in any event, we need not address it. The state did not advance that argument before the trial court despite ample opportunity to do so—indeed, despite the fact that that issue was the basis of defendant's suppression motion. Furthermore, the trial court implicitly concluded that the officer had extended the stop when it ruled that the officer had reasonable suspicion to do so. Under those circumstances, we decline to review the merits of the state's "right for the wrong reason" argument. *See Biggerstaff v. Board of County Commissioners*, 240 Or App 46, 56, 245 P3d 688 (2010) (declining to consider alternative bases for affirmance where "contentions were not preserved, much less fully developed").

[6] Because Husband testified that he believed that defendant possessed controlled substances, the subjective component of reasonable suspicion is not at issue in this case. Rather, the question is whether Husband's belief was objectively reasonable under the totality of the circumstances.

he believed that "subjects who are just off probation for a controlled substance offense * * * will continue to use controlled substances."

Those facts do not give rise to reasonable suspicion that defendant possessed drugs. We have repeatedly said that a person's presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that that person is himself or herself engaged in drug activity. *See, e.g., Rutledge,* 243 Or App at 610 (facts were insufficient to establish reasonable suspicion where the defendant "had just left a motel that the police believed was involved in drug activity, was in a car with a person suspected of drug activity, and acted nervously when asked about her purse"); *State v. Zumbrum,* 221 Or App 362, 369-70, 189 P3d 1235 (2008) (officers lacked reasonable suspicion that the defendant was involved with methamphetamine where he was staying in an apartment building with a high incidence of methamphetamine production and another individual staying in the apartment with the defendant was involved in drug dealing). It follows that it was not reasonable to infer that defendant, merely because she entered a residence associated with drug activity, was herself involved in criminal activity. The fact that defendant's presence at that location was brief, as opposed to some longer duration, does not alter that conclusion. *See State v. Broughton,* 221 Or App 580, 584, 193 P3d 978 (2008), *rev dismissed,* 348 Or 415 (2010) (officer lacked reasonable suspicion where the defendant visited a suspected drug house for "no longer than a minute"); *State v. Loud,* 149 Or App 250, 254, 942 P2d 814, *rev den,* 326 Or 58 (1997) (circumstances did not give rise to reasonable suspicion where the defendant had a "brief visit" with a suspicious person in an area known for drug sales).

Similarly, it is not reasonable to conclude that a person is involved in drug crimes because he or she is in the company of a known drug user or dealer. *Rutledge,* 243 Or App at 610; *see also Zumbrum,* 221 Or App at 369 ("The mere fact that a person associates with another person involved with methamphetamine does not support a reasonable suspicion that that person is also involved with methamphetamine."). Nor is it reasonable to believe

that a person possesses drugs because he or she has been convicted of a drug crime in the past. *See, e.g., State v. Frias,* 229 Or App 60, 210 P3d 914 (2009) (fact that the defendant was awaiting sentencing on drug charge, appeared to have used drugs in the past, and was evasive in response to questioning did not support reasonable suspicion that the defendant was currently engaged in a drug crime).

We conclude that those facts, in combination, do not give rise to reasonable suspicion under the circumstances of this case. The only fact that related to defendant herself was her probationary history for a past drug crime. The objective value of that fact is minimal. The other circumstances cited by the state were purely associational—defendant was in proximity to people or places associated with drug activity, but she was not herself engaged in conduct that suggested that she possessed drugs. *See State v. Regnier,* 229 Or App 525, 533-36, 212 P3d 1269 (2009) (individualized suspicion is required absent facts suggesting group participation in illegal activity). Thus, the officer's subjective suspicion that defendant was engaged in criminal activity was not objectively reasonable. The extension of the stop was unlawful under Article I, section 9.

Consequently, we must address the effect of that illegality on the admissibility of the evidence discovered during the consensual search that followed—that is, we must determine whether defendant's consent was derived from, or was the product of, the prior police illegality.[7] We resolve that issue under the analysis set forth in *State v. Hall,* 339 Or 7, 34-35, 115 P3d 908 (2005):

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. * * * Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view

---

[7] Defendant does not contend that her consent was involuntary.

several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct."

Here, the state does not dispute that defendant has established the existence of a minimal factual nexus. The officer obtained defendant's consent and discovered the incriminating evidence while the unlawful extension of the stop was ongoing. That is sufficient to establish the requisite nexus. *See State v. Ayles*, 348 Or 622, 634, 237 P3d 805 (2010) ("[T]he existence of a minimal factual nexus is obvious in cases in which the defendant consents to a search *** *during an illegal seizure*." (Emphasis in original.)); *Rodgers/Kirkeby*, 347 Or at 629-30 (the defendants showed a minimal factual nexus where consent was requested "during the period of unlawful detention").

Instead, the state relies on *State v. Hinds*, 225 Or App 470, 202 P3d 187, *rev den*, 347 Or 43 (2009), to argue that the effect of the unlawful police conduct was mitigated because the officer informed defendant of her right to refuse consent. In *Hinds*, the defendant had an encounter with police while walking near a bowling alley. During the encounter, one of the officers asked the defendant if he could conduct a patdown search for weapons. The officer told the defendant that he did not have to allow a patdown. The defendant nevertheless consented, and a pipe containing cocaine residue was subsequently discovered in the defendant's jacket pocket. We concluded that, assuming the encounter was an unlawful stop, the link between the unlawful police conduct and the defendant's consent "was too tenuous to require suppression" because the officer "told defendant that he did not have to consent to a patdown." *Id.* at 475.

However, that result does not necessarily obtain in every case where a defendant is informed of his or her right to refuse consent. In *State v. Shirk*, 248 Or App 278, 289, 273 P3d 254 (2012), we observed:

"We do not agree that the reference in *Hall* to the example of 'a police officer informing the defendant of the right to refuse consent' amounts to a ruling that, as a matter of law, in every case where the state establishes that a defendant was informed of a right to refuse consent, the state has established the requisite attenuation. Rather, as the court emphasized in *Ayles*, the 'totality of the circumstances' test is more nuanced than that."

In *Shirk*, the defendant was illegally seized and interrogated by police outside her motel room after she had denied them access to the room. During questioning, the defendant made incriminating statements. The police then sought consent to search her room. In doing so, they read the defendant a consent form, which included an advice of her right to refuse consent. The defendant signed the form. The search revealed further incriminating evidence. We concluded that the defendant's consent was not attenuated from the preceding illegality. We noted that the unlawful police conduct had yielded incriminating evidence before the police had sought the defendant's consent. In addition, we noted that, because the unlawful detention had been precipitated by the defendant's initial refusal to consent to a search of her room, the defendant would have had reason to believe that "she could end her detention only by consenting to a search of the room." *Id.* at 289-90. Thus, we determined that, "[i]n these particular circumstances, reading a statement informing defendant of her 'right to refuse consent' in order to obtain her consent to a search while being unlawfully detained for having refused such consent earlier, and immediately after an unlawful interrogation, does not purge the taint of the prior illegality." *Id.* at 290; *see also Ayles*, 348 Or at 637-39 (giving of *Miranda* warnings alone was insufficient to break the causal chain where, prior to administration of warnings, unlawful police conduct had led to discovery of incriminating evidence and the defendant's arrest, and police questioning pertained to that incriminating evidence).

In this case, the officer directed defendant to get out of the vehicle, advised defendant of his suspicions, and questioned defendant about probation. That questioning revealed that defendant had recently completed probation for a drug offense. The officer then inquired whether there

were drugs in the car and sought defendant's consent to search the car. Defendant asked whether she was required to consent. The officer indicated that she had a right to say no but also likely asked defendant why, if there were no drugs in the car, she would not consent to a search. Defendant then consented to a search. At the time of the consent, the officer continued to retain defendant's license. Moreover, there were several additional officers and police vehicles at the scene.

Under those circumstances, we conclude that the advice of rights alone was insufficient to sever the causal link between defendant's consent and the police illegality. On the one hand, the unlawful police conduct was ongoing at the time of defendant's consent, that is, the illegal detention was contemporaneous with—and therefore likely influenced—defendant's decision to consent. Other circumstances related to the nature of the unlawful conduct also may have had a bearing on defendant's decision to consent and may have made a search seem inevitable: the officer's singular focus on the presence of drugs, his retention of defendant's license, the authority exerted over defendant's freedom of movement, and the existence of additional officers and police vehicles.

On the other hand, of course, the officer informed defendant that she had a right to say no. However, that advice of rights was dampened by the officer's suggestion that defendant ought to consent if she had nothing to hide. In other words, the officer gave defendant reason to believe that, by exercising her right to decline consent, she would, in effect, be admitting that there were drugs in the vehicle. In that context, the mitigating effect of the officer's preceding statement—that defendant could say no—was undercut by the suggestion that saying no would in fact incriminate defendant. The state points to no other mitigating circumstances.

We conclude that the state did not carry its burden to show that, under the totality of the circumstances, defendant's decision to consent was attenuated from the police illegality. Accordingly, the evidence should have been suppressed.

Reversed and remanded.