Argued and submitted February 28, 2012, affirmed May 30, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MANUEL MEZA-GARCIA,
*Defendant-Appellant.*

Douglas County Circuit Court
09CR1720FE; A144513

303 P3d 975

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Douglas F. Zier, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Edmonds, Senior Judge.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for unlawful delivery of methamphetamine, ORS 475.890(2), and unlawful possession of methamphetamine, ORS 475.894. He assigns error to the trial court's denial of his motion to suppress evidence discovered after he consented, during a stop, to a search of a vehicle in which he was a passenger. Specifically, defendant argues that his consent to search was the product of an unlawful seizure under Article I, section 9, of the Oregon Constitution. The state responds that reasonable suspicion justified the stop and, alternatively, that defendant's consent was sufficiently attenuated from the unlawful police conduct to render the evidence admissible. We conclude that the stop was not supported by reasonable suspicion and was therefore unlawful. However, we also conclude that defendant's consent was sufficiently attenuated from the unlawful police conduct such that the evidence was admissible. Accordingly, we affirm.

We state the facts consistently with the trial court's express and implied findings where there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Trooper Wells of the Oregon State Police was concluding a traffic stop on Interstate 5 when he observed a Toyota 4Runner pass his marked patrol car in the adjacent northbound lane. He then stopped that vehicle near milepost 138 for failure to maintain a safe distance from an emergency vehicle. As Wells approached the front passenger side of the vehicle, he noticed that the vehicle had California license plates but contained no visible luggage. Defendant, who was in the passenger seat, was "very nervous," and he remained "continually nervous throughout [the] entire contact." While standing near the window, Wells observed two cell phones and a Jesus Malverde medallion; he also smelled a strong odor of air freshener that had no visible source.

Wells asked the driver, Fonseca, for his driver's license, vehicle registration, and proof of insurance. Although Fonseca did not have any form of identification, defendant

provided Wells with Fonseca's name and date of birth.[1] Defendant retrieved the registration and proof of insurance from the glove compartment, gave those documents to Wells, and explained that the vehicle, which was registered in California to a third party, belonged to a friend. Unprompted, defendant offered Wells his Oregon identification card, which Wells took and retained.[2] At some point, Wells asked defendant where he and Fonseca were going. Defendant responded that they had left Sacramento at about 2:00 a.m. and were traveling to Portland to visit defendant's uncle. Wells then returned to his patrol car to conduct a warrant check on Fonseca.[3]

While waiting on the results of the warrant check, Wells requested assistance from another state trooper, Bowersox, who arrived at the scene within 10 minutes. After Bowersox arrived, Wells approached the vehicle and asked defendant if it contained any drugs or weapons. Defendant replied, "No." Wells then provided defendant and Fonseca with a consent to search form, printed in both Spanish and English, and requested consent to search the vehicle. The consent to search form explained that defendant had "the right to refuse consent to a search" and that, if he refused, his "refusal [could not] be used against [him] for any purpose." Defendant read and signed the form consenting to the search. Defendant spoke to Fonseca in Spanish about the form, and Fonseca also signed it. The form was then returned to Wells. Wells searched the vehicle and discovered methamphetamine hidden in a speaker. After placing defendant in handcuffs and providing him with *Miranda* warnings (written in Spanish), Wells asked defendant what was in the speaker. Defendant replied in broken English, referencing "'crystal.'" Defendant was later charged with unlawful delivery of methamphetamine and unlawful possession of methamphetamine.

---

[1] Fonseca spoke only Spanish and was unable to communicate directly with Wells, who spoke English. Although defendant's primary language is Spanish, he spoke English to Wells and apparently translated for Wells and Fonseca.

[2] Wells testified at the suppression hearing that he could not remember whether he returned defendant's identification card at any point during the encounter.

[3] Wells testified at the suppression hearing that he could not remember whether he had asked defendant where he and Fonseca were going before or after taking defendant's identification card. Wells knew, however, that he had asked that question before he returned to his patrol car to conduct the warrant check.

Defendant filed a motion to suppress the evidence discovered as a result of the search. Defendant argued that Wells unlawfully stopped him without reasonable suspicion of criminal activity. Defendant further argued that his consent to search the vehicle was the product of that unlawful stop and, accordingly, that the evidence discovered as a result of the search was inadmissible. The state, for its part, conceded that defendant was stopped "at the point where [Wells went] back to run the wants and warrants check," but argued that the stop was supported by reasonable suspicion of drug trafficking. The state additionally made two alternative arguments: first, that defendant's consent was only tenuously related to the unlawful police conduct and, second, that Fonseca's consent provided a lawful independent source for the admission of the evidence.

The trial court concluded that Wells had reasonable suspicion of drug trafficking when he took defendant's identification card. Specifically, the court found several "indicators" that, considered in the "totality of the circumstances," provided Wells with reasonable suspicion. Those indicators were as follows: (1) the vehicle was traveling northbound on Interstate 5 with California license plates; (2) the presence of two occupants in the vehicle; (3) the absence of luggage in the vehicle; (4) the presence of two cell phones in the vehicle; (5) the strong odor of air freshener, for which there was no visible source; (6) defendant's nervousness; and (7) the third-party registration of the vehicle.[4] The court also concluded that defendant's statement that he was traveling from Sacramento to Portland to visit his uncle provided "continued

---

[4] As noted, the court concluded that those indicators, considered together, gave rise to reasonable suspicion. However, the court then stated that

"[t]here was also the mention of the necklace hanging from the mirror, rear view mirror, that Trooper Wells stated he recognized as that of the Saint Jesus Malverde, which he stated in his training and experience * * * is often associated with narcotics trafficking. And again that alone would not be sufficient to raise reasonable suspicion."

It is unclear whether the trial court relied on the presence of the Jesus Malverde medallion in concluding that the stop was supported by reasonable suspicion. In any event, as in previous cases, we decline to consider the medallion in determining whether Wells had reasonable suspicion of drug trafficking. *See State v. Maciel*, 254 Or App 530, 538, 295 P3d 145 (2013) (declining to consider the presence of a "religious medallion" that an officer associated with narcotics trafficking); *State v. De La Rosa*, 228 Or App 666, 674 n 2, 208 P3d 1012 (2009) (same).

reasonable suspicion" justifying the stop. Finally, the court found that Wells provided defendant with a bilingual consent to search form and that defendant signed that form, consenting to the search.

Following a bench trial, defendant was found guilty of unlawful delivery of methamphetamine and unlawful possession of methamphetamine.

On appeal, defendant renews his argument that the stop was not supported by reasonable suspicion and that his consent was the product of that unlawful stop. The state first argues, as an alternative basis for affirmance, that defendant was not personally stopped because "defendant spontaneously handed [Wells] an Oregon identification card" and the "record does not indicate that the trooper ran defendant's name in his records check." As noted, the state conceded below that defendant was stopped when Wells returned to his patrol car after taking and retaining defendant's identification card. Had the state made—instead of conceded—its argument below, defendant could have developed a different record in response. Furthermore, the trial court implicitly concluded that Wells stopped defendant when it ruled that he had reasonable suspicion to do so. Under those circumstances, we will not consider the merits of the state's argument for the first time on appeal. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (setting out conditions under which a reviewing court may affirm the ruling of a lower court on an alternative basis); *see also State v. Bertsch*, 251 Or App 128, 133 n 5, 284 P3d 502 (2012) (declining to consider the state's argument on appeal that an officer did not extend a stop where the state had not advanced that argument before the trial court and the trial court had implicitly concluded that the officer had extended the stop when it ruled that the officer had reasonable suspicion to do so).[5]

---

[5] Additionally, the state argues that any illegality "violated only the driver's rights and not the passenger's." That argument, however, is predicated on its assumption that defendant was not personally stopped. For the reasons explained above, we reject that argument without further discussion. *See also State v. Knapp*, 253 Or App 151, 155-56, 290 P3d 816 (2012) (where a defendant passenger establishes that his personal rights have been violated, the question is whether the "defendant is entitled to suppression of the disputed evidence based on

Alternatively, the state responds that the stop was supported by reasonable suspicion and that, even if it was not, defendant's consent was sufficiently attenuated from the unlawful police conduct to render the evidence admissible.[6] Accordingly, we first consider whether Wells's stop of defendant was supported by reasonable suspicion that defendant was engaged in drug-related criminal activity.

> "A stop of a person by a police officer is supported by reasonable suspicion when the officer subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop."[7]

*State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013) (citing *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997)). An "officer's training and experience are relevant considerations that bear on the reasonable factual inferences that an officer may draw." *Id.* However, reasonable suspicion must be based on specific and articulable facts. *Id.* (citing *Ehly*, 317 Or at 80). Here, as noted, the trial court determined that the following indicators, considered together, gave rise to reasonable suspicion: (1) the vehicle was traveling northbound on Interstate 5 with California license plates; (2) the presence of two occupants in the vehicle; (3) the absence of luggage in the vehicle; (4) the presence of two cell phones in the vehicle; (5) the strong odor of air freshener, for which there was no visible source; (6) defendant's nervousness; and (7) the third-party registration of the vehicle. Additionally, we consider defendant's statement that he had left Sacramento at 2:00 a.m. and was traveling from Sacramento to Portland to visit his uncle.[8]

---

*that* illegality," not whether police violated the rights of the driver (emphasis in original)).

[6] The state also argues, as it did below, that "police authority to search this vehicle also came from an independent source"—Fonseca's consent—and that, accordingly, the evidence is admissible. We need not address the merits of that argument given our disposition of the case.

[7] The subjective component of reasonable suspicion is not at issue in this case, and the only question on appeal is whether Wells's belief was objectively reasonable under the circumstances.

[8] As noted, the state conceded below that defendant was stopped when Wells returned to his patrol car to run a warrant check on Fonseca; the trial court suggested, however, that defendant was stopped earlier, at the point when he gave

We conclude that those facts, considered in their totality, do not give rise to reasonable suspicion that defendant was engaged in drug-related criminal activity. As an initial matter, the fact that the vehicle contained two occupants and two cell phones has no bearing on reasonable suspicion. Wells testified at the suppression hearing that those facts were significant to him because, in his "limited experience," drug traffickers will generally use two people to transport drugs in vehicles and "there will be multiple cell phones in a vehicle." Wells admitted, however, that he had "seen seizures that had as many as seven people in a vehicle and as little as one person in a vehicle" and that observing multiple people with personal cell phones is common. Put frankly, the presence of two persons and two cell phones in a vehicle is wholly unremarkable.

Similarly, we have held that "there is nothing inherently suspicious about * * * being nervous when pulled over by a police officer." *State v. Berry*, 232 Or App 612, 618, 222 P3d 758 (2009), *rev dismissed*, 348 Or 71 (2010). Accordingly, defendant's nervousness adds little, if any, weight toward reasonable suspicion. *See, e.g., State v. Espinoza-Barragan*, 253 Or App 743, 753, 293 P3d 1072 (2012) (fact that the defendant was nervous and evasive, considered in combination with other facts, did not give rise to reasonable suspicion); *State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011) (same); *State v. Juarez-Godinez*, 135 Or App 591, 606-07, 900 P2d 1044 (1995), *aff'd on other grounds*, 326 Or 1, 942 P2d 772 (1997) (same).

The same is true of the fact that the vehicle was registered to a third party. As to that indicator, Wells testified that "illegal narcotics are generally transported in a third-party vehicle that does not belong to any of the occupants inside the vehicle." We have held, however, that a third-party registration, combined with similar testimony from a police officer, carries "little weight" in establishing reasonable suspicion. *Maciel*, 254 Or App at 539; *see also*

---

Wells his identification card. Because we conclude that Wells lacked reasonable suspicion that defendant was engaged in drug-related criminal activity at the time that he returned to his patrol car, we need not determine the exact point at which defendant was stopped for purposes of Article I, section 9.

*Juarez-Godinez*, 135 Or App at 606-07 (fact that the defendant was driving a car registered to a third party, considered in combination with other facts, did not give rise to reasonable suspicion).

As to the facts indicating that defendant was traveling a long distance—the California license plates, northbound direction of travel, and defendant's statement that he and Fonseca were traveling from Sacramento to Portland to visit defendant's uncle—Wells testified that they were significant in combination with his observation that the vehicle contained no luggage. Specifically, he testified that drug traffickers "don't like to have any down time, so generally it's just a round trip. They'll go from point A to point B without stopping to sleep, and there is no, really, need for any extra clothes or toiletries if that's the case, just one round trip."

We have held that the absence of luggage in a vehicle is of no consequence where the luggage may have been stored out of plain view. *Maciel*, 254 Or App at 538; *see also Juarez-Godinez*, 135 Or App at 607 ("The lack of visible luggage also adds nothing, because, with three adults riding in the vehicle, any luggage would likely have been placed in the trunk."). Here, Wells testified that he examined the vehicle as he approached it from the rear, but it is unclear from the record whether the vehicle contained compartments that could have shielded personal belongings from view. *See Espinoza-Barragan*, 253 Or App at 752 ("An officer cannot conclude that a driver is not carrying any luggage if the officer does not, or cannot, look into places in the driver's vehicle that are likely to hold luggage."). In any event, as we recently noted, "even if defendant was not carrying luggage, that fact is one that we and the Supreme Court have considered, in combination with other facts, in similar cases and concluded that the officer did not have reasonable suspicion of drug activity." *Id.*; *see also State v. Dominguez-Martinez*, 321 Or 206, 213 n 6, 895 P2d 306 (1995) (facts, including the "type of vehicle; California plates; travel from California to Washington; young, Hispanic men; and lack of luggage," did not give rise to reasonable suspicion of drug-related criminal activity).

We are left to consider the fact that, while standing near the window of the vehicle, Wells smelled a strong odor of air freshener that had no visible source. Wells testified that "vehicles that transport illegal narcotics attempt many means to mask any odors that could be potentially detected by police canines" and that, "when you have a stronger odor, it's * * * attempting to mask something." That fact, however, is not sufficient, either alone or in combination with the other indicators that Wells identified, to establish reasonable suspicion of drug activity. *See Juarez-Godinez*, 135 Or App at 606-07 (facts, including a "heavy odor of air freshener in the vehicle," did not give rise to reasonable suspicion of drug-related criminal activity (internal quotation marks omitted)).

Of course, we must still consider those facts together. One case is particularly illustrative and, in fact, concerns many of the same "indicators" present here. In *Juarez-Godinez*, we considered whether an officer had reasonable suspicion of drug-related criminal activity. The defendant and two passengers were traveling on to Tacoma, Washington, when they were pulled over for a traffic violation. 135 Or App at 593. The officer testified:

> "From my training and experience, I noticed several characteristics displayed by the occupants of the vehicle that I know are often the same characteristics displayed by known narcotics traffickers. I noticed a heavy odor of air freshener in the vehicle. I did not see any luggage in the vehicle. I noticed that all occupants were wearing newly purchased clothing. The driver was wearing a gold necklace, a gold ring, and had salon-styled hair. A third-party [vehicle] registration is also very common with narcotics traffickers. I also know through my training and experience that Tacoma, Washington, * * * is a frequent destination of narcotics traffickers."

*Id.* at 606 (internal quotation marks omitted; brackets in original). Additionally, the officer testified that the defendant became "visibly nervous" when asked for consent to search the vehicle. *Id.* at 607 (internal quotation marks omitted). We held that "none of those observations, either individually or collectively, justify a reasonable suspicion that the vehicle contained controlled substances." *Id.*

Here, as in *Juarez-Godinez*, each fact on which the state relies—defendant's nervousness; the vehicle's third-party registration; the lack of luggage on a long distance trip; and the strong odor of air freshener—carries such little weight in establishing reasonable suspicion that, even collectively, the facts fail to meet that standard. Considered in their totality, they simply do not give rise to a reasonable suspicion that defendant was engaged in drug-related criminal activity. Accordingly, Wells's stop of defendant was unlawful.

Nevertheless, we must still consider whether Article I, section 9, requires that the evidence discovered as a result of defendant's consent to search the vehicle be suppressed. In *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005), the Supreme Court described the applicable framework:

"[A]fter a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

(Citations omitted.)

Here, the state does not argue that defendant failed to establish a minimal factual nexus between the unlawful stop and the evidence that was discovered. Defendant consented to the search during the course of the unlawful stop. That is sufficient to establish the minimal factual nexus required under *Hall*. *See State v. Kolb*, 251 Or App 303, 315, 283 P3d 423 (2012) (minimal factual nexus standard satisfied where the defendant consented to a search during

an unlawful stop); *see also State v. Courtney*, 242 Or App 321, 328, 255 P3d 577, *rev den*, 351 Or 401 (2011) ("[I]t will be the rare case where, although the evidence is discovered during an ongoing unlawful seizure, the satisfaction of the minimal factual nexus standard is not obvious.").

Rather, as noted, the state argues that defendant's consent was sufficiently attenuated from the unlawful stop to render the evidence admissible. Where a defendant has shown a minimal factual nexus between the unlawful police conduct and the defendant's consent, the burden shifts to the state to show that "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 35. "[A] causal connection requiring suppression exists when the police take advantage of the circumstances of their unlawful conduct to obtain the defendant's consent to search." *Id.* at 28 (internal quotation marks and brackets omitted). In *Hall*, the Supreme Court noted that that determination requires a "fact-specific inquiry into the totality of the circumstances" and explained:

> "A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances— such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* at 35 (footnote omitted).

We conclude that the state proved that defendant's consent was sufficiently attenuated from the unlawful police conduct to render the evidence admissible. As noted, the unlawful stop was ongoing at the time that Wells asked

defendant for consent to search the vehicle. Accordingly, the temporal proximity factor identified in *Hall* clearly weighs in defendant's favor. Apart from that, however, there is no evidence that Wells took advantage of the unlawful stop in order to gain defendant's consent. There is no evidence that Wells gained any advantage from the unlawful stop— in the form of new information or otherwise—that caused him to seek defendant's consent to search the vehicle. Even if the unlawful stop began at the point at which Wells accepted defendant's identification card, the only arguably relevant information that Wells gained during that stop was that defendant had left Sacramento at 2:00 a.m. and was traveling to Portland to visit his uncle. Wells testified that he felt that he had reasonable suspicion of drug trafficking before he learned that information, and there is no evidence that Wells requested defendant's consent to search the vehicle as a result of it.[9]

More importantly, however, another factor identified in *Hall*—the presence of mitigating circumstances—strongly weighs in the state's favor. Specifically, Wells provided defendant with a consent to search form, printed in both Spanish and English; that document explicitly informed defendant that he had "the right to refuse consent to a search" and that, if he refused, the "refusal [could not] be used against [him] for any purpose." Defendant read and signed the form. At no time did Wells suggest to defendant that a refusal to consent would imply that defendant was hiding contraband. *See Bertsch*, 251 Or App at 138 (advice of right to refuse consent to search did not mitigate the effect of unlawful police conduct where the officer suggested that the defendant would consent if she had nothing to hide). Additionally, the fact that defendant spoke to Fonseca in Spanish about the consent to search form before that form was returned to Wells suggests that defendant made a considered and deliberate choice to consent. Under those circumstances, the fact that defendant was informed of his right to refuse consent mitigates the effect of the unlawful police conduct on his decision to do so.

---

[9] Moreover, the new information—that defendant was traveling to Portland to visit a relative—was not the type of information that would suggest a need to search the vehicle, even when considered in conjunction with the circumstances that Wells had observed prior to the unlawful stop.

Accordingly, the state proved that defendant's consent was sufficiently attenuated from the unlawful police conduct such that the evidence was admissible under Article I, section 9. *See State v. Hinds*, 225 Or App 470, 475, 202 P3d 187, *rev den*, 347 Or 43 (2009) (concluding that the defendant's consent was sufficiently attenuated from any unlawful police conduct where, "although the temporal proximity was close, [the officer] told [the] defendant that he did not have to consent to a patdown—precisely the sort of mitigating circumstance that the Supreme Court identified in *Hall*").[10]

In sum, the stop of defendant was not supported by reasonable suspicion and was therefore unlawful. However, because defendant's consent to search was sufficiently attenuated from the unlawful police conduct, the evidence was admissible. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

[10] Defendant notes that, in *State v. Shirk*, 248 Or App 278, 289, 273 P3d 254 (2012), we stated that "the reference in *Hall* to the example of 'a police officer informing the defendant of the right to refuse consent' [does not] amount[] to a ruling that, as a matter of law, in every case where the state establishes that a defendant was informed of a right to refuse consent, the state has established the requisite attenuation." We adhere to that description of *Hall*. To the extent, however, that defendant is arguing that the present case is controlled by *Shirk*, we disagree. In that case, we held that the fact that the defendant was advised of her right to refuse to consent to a search did not mitigate the unlawful police conduct where the defendant was being unlawfully detained precisely because she had earlier refused to consent to a search of her hotel room. 248 Or App at 289. We concluded that the "defendant would have had every reason to believe that she was being detained because she had attempted to keep the officers out of the room and that she could end her detention only by consenting to a search of the room." *Id.* at 289-90. Thus, *Shirk* involved circumstances where "the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent." *Hall*, 339 Or at 35. Here, in contrast, the police conduct before and during the unlawful stop did not affect defendant's decision to consent beyond whatever effect resulted from the detention itself.